IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and STATE OF TENNESSEE, | : : : | |
| Plaintiff, | : : | |
| v. | : : | CASE NO.: 2:21-CV-00080-JRG-CRW |
| WALGREEN CO., | : : : | |
| Defendant. | : : : : | |

**NON-PARTY MAGELLAN MEDICAID ADMINISTRATION, INC.'S MOTION TO ALLOCATE COST**

Pursuant to Federal Rule of Civil Procedure 26, Magellan Medicaid Administration, Inc. ("Magellan"), a non-party to the above-titled action, hereby enters this special limited appearance for the purpose of requesting that the Court allocate cost for its ongoing efforts to produce electronically stored information ("ESI") in response to Walgreen Company's ("Walgreens") Request for Production to the Plaintiffs.

**INTRODUCTION**

Magellan served as the pharmacy benefit administrator ("PBA") for the State of Tennessee Medicaid Program ("TennCare") from December 20, 2012 through December 31, 2019. *See* Complaint ("Compl."), Doc. 1, ¶ 21. As a result, Magellan indisputably has discoverable documents and electronically stored information ("ESI") relevant to this matter. But Walgreens did not issue a subpoena to Magellan for documents and ESI; instead, Walgreens took a calculated risk and requested them via Requests for Production ("RFPs") to the State of Tennessee (the "State"). Although it had no contractual obligation to do so, Magellan voluntarily provided many

of the requested documents (most of which the State already had in its possession) so that the State could respond to Walgreens' RFPs. The only outstanding issue that remains is ESI, and, in particular, Magellan's e-mails. Magellan's reluctance to-date was not because Magellan did not wish to cooperate with the parties – in fact, it did and still does. The issue is the enormous cost of e-discovery. Magellan maintains that forcing it to bear the entire cost of the ESI production would be an undue burden for a non-party with no pecuniary interest in the outcome of this case. Accordingly, Magellan respectfully requests that the Court cap its costs in responding Walgreens' RFPs to the State[1] at $62,000, and allocate all further vendor costs for ESI and document review between the State and Walgreens.

## BACKGROUND

### A. Magellan's Good Faith Efforts to Assist the State with its Response to Walgreens' RFPs Between August 2, 2021 and December 20, 2021

Between August 2, 2021 and December 20, 2021, all requests to Magellan for documents or information came through the State. Walgreens did not issue a subpoena to Magellan seeking documents or ESI pursuant to Fed. R. Civ. P. 45 or otherwise contact Magellan directly regarding those documents. On August 2, 2021, Walgreens served its First Set of RFPs on Plaintiffs, which called for production of extensive "communications" pertaining to Plaintiff's claims, the 65 underlying patients, the four DAAs, TennCare's prior authorization criteria, and several other topics. *See* Motion to Compel, Doc. 45, 45-1. The State then requested certain documents from Magellan (most of which had already been provided following contract termination) and Magellan voluntarily provided those documents to the State. Magellan received no indication from the State that it was dissatisfied with Magellan's production.

---

[1] Magellan would also request that this cap apply to any future Rule 45 subpoena that Walgreens may issue to Magellan requesting the same documents it has currently requested via RFPs to Plaintiffs.

06337012.1          2

On October 21, 2021, Magellan became aware of the scope of the ESI sought by Walgreens when the State provided Magellan with Walgreens' outrageous list of 69 proposed Magellan custodians[2] (8 corporate custodians and 61 prior authorization custodians) along with a proposed date range spanning from 2010 to present. *See* Exhibit 1, Declaration of J. Collins ("Collins Decl.") at ¶ 17 and Ex. G thereto (M. Dziuban Email to R. McConkey et. al., October 20, 2021) at 2-3. This was the same day that Walgreens filed a Motion to Compel Plaintiffs' Compliance With Discovery Obligations.[3] *See* Motion to Compel, Doc. 45. Magellan understood that the custodians, the time-frame of the requested search, and the list of search terms were subject to further negotiation between the State and Walgreens. Although Magellan understood that it did not have a contractual obligation to engage in e-discovery on the State's behalf, it was willing to voluntarily cooperate (without issuance of a subpoena) if the Parties' ESI negotiations resulted in a proportional search with reasonable costs.[4]

On December 14, 2021, the Court held a hearing on Walgreens' Motion to Compel and directed a meet and confer between the parties and Magellan. *See* December 14, 2021 Hearing Transcript, Doc. 63. The Court further advised that it would afford Magellan an opportunity to be

---

[2] Walgreens' custodian list contained a total of 70 individuals (8 corporate-level custodians and 62 prior authorization custodians), however Magellan identified one prior authorization custodian, Zhaquaia Boyd, whose name appeared on the list twice.

[3] Walgreens' Motion to Compel did not complain about the absence of any particular production, but instead sought entry of an order compelling Plaintiffs "to ensure their productions of documents and information in the custody of their agents and contractual partners [including Magellan]… in response to Walgreens' discovery requests are complete and accurate." (*Id.* at p. 1). Plaintiffs' responded to Walgreens' Motion to Compel by arguing that, while TennCare's contract requires Magellan to preserve certain records post-contract termination (which Magellan produced), the contract does not grant the State "possession, custody or control" over Magellan's internal email environment and, as such, the State had no legal right to direct Magellan to conduct e-discovery searches for dozens of custodians spanning more than a decade. *See generally* Plaintiffs' Response to Motion to Compel, Doc. 50.

[4] On October 28, 2021, Magellan received Walgreens' preliminary list of search terms Walgreens requested TennCare and Magellan run across all custodians. However due to syntax and other errors, these search terms failed. It was not until more than a month later, on December 20, that Magellan received a revised search terms list tailored specifically to Magellan, which included additional search terms. *See* Ex. H to Collins Decl. (A. Campbell Email to J. Collins et. al., December 20, 2021) at 12.

heard as to the scope of the discovery sought as well as any cost-shifting for those efforts. *Id*. at pg. 14, 1.6-22.

### B. Magellan's Good Faith Efforts to Work with the State and Walgreens Since December 20, 2021

On December 20, 2021, at the Court's request, Magellan joined the parties' meet and confer and for the first time had an opportunity to discuss the scope of the requested ESI review with Walgreens. Magellan advised Walgreens that the 61 prior authorization custodians worked almost exclusively in Magellan's FirstTrax claims system which documents their communications, authorizations, and claims related notes, and that all records from that system were previously provided to the State for production to Walgreens. Collins Decl. at ¶ 3. Magellan further advised that, due to the nature of their job duties and the need for multiple reviewers to have access to the same information, these custodians rarely communicated about claim authorizations via email. *Id.* at ¶ 4.[5] Accordingly, Magellan advised that processing and searching e-mail data for such an extended time-period for all requested custodians was not proportional and was unlikely to generate responsive information. *Id.* at ¶ 5. Magellan suggested that e-mails for a handful of prior authorization custodians be pulled initially so relevance and scope could be tested before ingesting more data at a considerable expense. *Id.*

Magellan also raised the issue of the overly broad time frame for the ESI searches (January 2010 to present) and the fact that this was beyond the time period of the Complaint (October 1, 2014 to December 31, 2016) as well as the time period of Magellan's former contract with the

---

[5] Two days after the December 20, 2021 meet and confer, and despite the fact that Magellan had just received confirmation of the (unilaterally selected) custodians and search terms, Walgreens advised that it was "deeply concerned about the delays to date in searching for responsive Magellan email data" and that if "further delays" were encountered they would be brought to the Court's attention. *See* Ex. H to Collins Decl. (M. Dziuban Email to J. Collins et. al., December 22, 2021) at 9-10.

State (December 20, 2012 to December 31, 2019). *Id.* at ¶ 6. The number of custodians and time frame for the proposed search was critical because those factors would dictate how much data Magellan's vendor would need to retrieve, ingest, and host within its review platform and, equally important, the costs associated with responding to Walgreens' ESI requests. Unfortunately, Walgreens would not agree to reduce the number of custodians or narrow the time frame for the searches. *Id.* at ¶ 7. Walgreens did, however, agree to revise its search terms again, and to identify a list of "priority" custodians (5 corporate-level custodians and 2 prior authorization custodians) for Magellan to begin collection, search, and review efforts. *See* Ex. H to Collins Decl. (M. Dziuban Email to J. Collins et. al., December 22, 2022) at 9-10. Walgreens provided this information for the corporate custodians on December 22, 2021 and for the reviewer custodians on January 14, 2022. *See id.* at 9-10; 3-4. Magellan remained hopeful that Walgreens would reduce its demands once the parties appreciated the volume and scope of the data.

During the parties follow up meet and confer on January 7, 2022, Magellan again expressed concern about the relevancy, proportionality and costs of processing and reviewing email data for all 69 custodians spanning 12 years, but Walgreens was again unwilling to compromise. Collins Decl. at ¶ 6. With Walgreens' information on priority custodians, Magellan had its vendor retrieve and ingest data with the hope that Walgreens would agree to negotiate once the burden and enormous volume was understood after running the search terms, on which Walgreens refused to negotiate.[6] Because Walgreens refused to limit the time frame, Magellan had its ESI vendor ingest data for 13 custodians (7 priority custodians and 5 additional custodians) for the entire time period

---

[6] Walgreens ultimately rescinded its agreement to priority custodians five days later on January 19, 2022. Walgreens demanded instead that Magellan search, review and produce all Magellan records – more than 1 TB of data – to be completed within 9 days. *See* Ex. H to Collins Decl. (M. Dziuban Email to J. Collins et. al., January 19, 2022) at 2-3. Magellan indicated that its collection and processing for the five corporate priority custodians had already begun, but that it could not meaningfully review and produce that amount of data in 9 days. *See* Ex. H to Collins Decl. (J. Collins Email to M. Dziuban et. al., January 20, 2022) at 1.

between January 2010 and the date of ingestion. By January 28, 2022, Magellan's ESI vendor had already ingested (at a significant cost) more than 1 Million records for these custodians. *See* Ex. I to Collins Decl. (T. Panciera Email to M. Dziuban et. al., January 28, 2022) at 1. On February 9, 2022, Walgreens filed its second Motion to Compel against the Plaintiffs because Magellan had yet to process, review and produce e-mail data for all 69 custodians. *See* Motion to Compel, Doc. 70.

On February 17, 2022, the Court held a hearing on Walgreens' second Motion to Compel and directed the parties to meet and confer in an effort to narrow the scope of discovery and reduce the associated ESI cost. *See* February 17, 2022 Hearing Transcript, Doc. 86, p. 15, l. 20-25 – p. 16, l. 1-7. Based on those discussions, Walgreens agreed to reduce the number of prior authorization custodians from 61 to 17, limit the relevant time frame for the prior authorization custodians (October 1, 2014 to December 31, 2016), revise and limit certain search term strings to be specific to the TennCare program, and allow the use of technology assisted review ("TAR") to potentially reduce the number of documents subject to review. Collins Decl. at ¶ 8. After implementing these modifications, the scope of the documents to be processed and reviewed has been materially reduced. *Id.* at ¶ 9. Although Magellan appreciates Walgreens' efforts to address scope and proportionality, the ESI costs already incurred along with the estimated future ESI costs remain significant.[7]

---

[7] Although Walgreens' modified certain search term strings to be specific to the TennCare program, Magellan nevertheless anticipates that the documents subject to review will include: (1) documents unrelated to the TennCare program which are subject to agreements with third-parties not to disclose confidential information, and (2) documents containing protected health information ("PHI") of patients/members enrolled in unrelated healthcare plans whose medical information is subject to the privacy requirements set forth in the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and/or 42 C.F.R. Part 2. Accordingly, Magellan is required to review and exclude such irrelevant, confidential information from its production.

### C. The Costs Associated with Responding to Walgreens' ESI Requests

Magellan has incurred significant costs already to retrieve, ingest, and host 828 GB of e-mail data for Walgreens' 8 corporate custodians and 5 priority reviewer custodians from as early as January 2010 to the present date. Ingesting and hosting the e-mail for these 13 original custodians for the months of January and February has cost Magellan a total of $61,530.31. *Id.* at ¶ 11-12. Projected ingestion and hosting costs for these custodians for the month of March is estimated to be another $16,350. *Id.* at ¶ 13. Magellan's ESI vendor anticipates that it will cost another $60,960 to $77,892 to search and review e-mail records for these custodians based on the currently agreed upon terms. *Id.* at ¶ 14.

Under the current protocol agreed upon by the parties, Magellan must retrieve, ingest, and host data for 12 additional prior authorization custodians between October 1, 2014 and December 31, 2016. Magellan's vendor estimates this will cost another $3,094. *Id.* at ¶ 15. Magellan's vendor also anticipates it will cost another $6,893 to $8,809 to search and review e-mail records for these custodians based on the currently agreed up on terms. *Id.* at ¶ 16. The total cost ($61,530.31 of which has already been incurred) to retrieve, ingest, host, and review e-mail data requested by Walgreens, assuming the search terms are not significantly modified and additional custodians are not added, amounts to an estimated $148,826.98 to $167,674.98. *Id.* at ¶ 10.

## LEGAL STANDARD

A party may seek documents in one of two ways. If documents are within the "possession, custody, or control of a party," the party seeking the documents can issue a Request for Production under Rule 34. *See* Fed. R. Civ. P. 34(a)(1) ("Any party may serve on any other party a request to produce … any designated documents … or to inspect and copy, test, or sample tangible things … which are in the *possession, custody or control* of the party upon whom the request is served."). If

the documents are not within the "possession, custody, or control of a party," the party seeking the documents must issue a subpoena under Rule 45. The Sixth Circuit has held that "documents are deemed to be within the possession, custody or control" for purposes of Rule 34 if the party has actual possession, custody or control, or has the right to obtain such documents on demand." *In re Bankers Trust Co.*, 61 F.3d 465, 469 (6th Cir. 1995).

All document requests, no matter how issued, must comply with the discovery limitations of Rule 26(b), which limits all requests for production whether to parties or non-parties, to "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). The Court, on motion or on its own, must limit the extent of requests for production if it determines that "the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive" *Id.* 26(b)(2)(C). Courts must be particularly attuned to issues of burden and costs in matters involving non-parties. *See Pollitt v. Mobay Chem. Corp.*, 95 F.R.D. 101, 105 (S.D. Ohio 1982) ("this Court must be sensitive to the potential burden imposed on a non-party during discovery, by balancing the need for the material against the burden (financial or otherwise) to be imposed..."); *Medical Ctr. at Elizabeth Place, LLC v. Premier Health Partners*, 294 F.R.D. 87, 92 (S.D. Ohio 2013) (same).

Generally, the party responding to a discovery request, including requests for production, bears the cost of compliance. *Medtronic Sofamor Danek, Inc. v. Michelson*, 229 F.R.D. 550, 553 (W.D. Tenn. 2003) (relying on *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 358, 98 S.Ct.

06337012.1                                    8

Case 2:21-cv-00080-JRG-CRW   Document 100   Filed 03/09/22   Page 8 of 17   PageID #: 1657

2380, 57 L.Ed.2d 253 (1978)). The court may, however, shift cost under Rule 26 to "protect a party or person from . . . undue expense." *Id.*; Fed. R. Civ. P. 26(c); *Lawson v. Spirit Aerosystems, Inc.*, 202 WL 3288058, *8 (D. Kan. June 18, 2020) (recognizing that Rule 26(c) is "not limited to non-reasonably accessible discovery, and it was amended in 2015 to make clear that the court may allocate discovery expenses for good cause to protect a party from undue burden or expense."); *FDIC v. Brudnicki*, 291 FRD 669, 675 – 676 (N.D. Fla. 2013) (finding inaccessibility analysis inappropriate in case that did not involve classic cost associated with retrieval of ESI from back up tapes).

With respect to how to protect parties and shift costs, "[t]he options available are limited only by the court's own imagination and the quality and quantity of the factual information provided by the parties to be used by the Court in evaluating the Rule 26(b) factors." *Thompson v. U.S. Dep't of Housing and Urban Dev.*, 219 F.R.D. 93, 98 (D. Md. 2003). Courts have applied a number of multi-factorial tests. The test in *Rowe Entertainment v. The Williams Morris Agency, Inc.* is widely cited and instructive and directs courts to consider on a case-by-case basis:

> (1) the specificity of the discovery requests; (2) the likelihood of discovering critical information; (3) the availability of such information from other sources; (4) the purposes for which the responding party maintains the requested data; (5) the relative benefit to the parties of obtaining the information; (6) the total cost associated with the production; (7) the relative ability of each party to control costs and its incentive to do so; and (8) the resources available to each party.

*Medtronic Sofamor Danek, Inc.*, 229 F.R.D. at 553 (quoting *Rowe Entertainment*, 205 F.R.D. at 428–29). Most courts consider the first three factors — sometimes known as the marginal utility test — to be the most important. *Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 323 (S.D.N.Y. 2003).

*Rowe Entertainment* did not involve a non-party, but "[n]onparty status is [also] an important factor to be considered in determining whether to allocate discovery costs on the demanding or the producing party." *U.S. v. Columbia Broadcasting System, Inc.*, 666 F.2d 364, 369 (9th Cir. 1982). This applies regardless of whether the court is addressing a request under Rule 34 or Rule 45. *Id.* Courts recognize that regardless of the procedural mechanism the requesting party uses, forcing nonparties to bear the costs of litigation is dangerous and unfair because "when nonparties are forced to pay the costs of discovery, the requesting party has no incentive to deter it from engaging in fishing expeditions for marginally relevant material." *Kean v. Van Dyken*, at *14-15 (W.D. Mich. Feb. 16, 2006) (quoting *Linder v. Calero-Portocarrero*, 183 F.R.D. 314, 322-23 (D.D.C. 1998)).

## ARGUMENT

### A. Magellan's Cost to Produce ESI Have Been, and Will Continue to Be an Undue Burden, and Cost Shifting is Appropriate.

This court has recognized in the last two discovery-related hearings that while Magellan must produce documents in this case, in one way or another, it is unreasonable to require Magellan to bear the full cost of doing so. As a result, the Court specifically granted Magellan an opportunity to brief the issue of costs. Applying the undue burden standard as articulated in *Rowe Entertainment* and similar cases, cost shifting is appropriate under Rule 26(c).

#### 1. Walgreens' RFPs were neither specific nor reasonably limited in time and scope which resulted in significant, unnecessary costs.

Walgreens initial request for Magellan's ESI involved an overly broad time period and excessive custodians unlikely to have relevant information. This led to Magellan unnecessarily expending cost to ingest irrelevant data (for purposes of being searched) and will likely result in increased ongoing cost. This factor weighs in favor of cost shifting.

Walgreen's appears to be seeking the e-mails at issue to determine how Magellan personnel were trained and instructed to apply TennCare's prior authorization criteria, whether that criteria were consistently applied, and whether discrepancies were knowingly ignored. Even assuming that such information would be relevant to the issue of materiality (Magellan does not concede that it would be), *see Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 195 (2016) (discussing government's actual handling of claims as consideration in materiality inquiry), that does not mean that Walgreens is entitled to embark on a fishing expedition seeking the internal emails of every single employee who unwittingly approved a false claim submitted by Walgreens' pharmacist for a time period potentially encompassing four years before and four years after the claims at issue.[8] This defies the marginal utility analysis prized in the case law.

Although the claims at issue in the Complaint were processed between October 1, 2014 and December 31, 2016, and Magellan only served as the State's PBA between December 20, 2012 and December 31, 2019, Walgreens demanded that Magellan ingest and process data for **69** custodians from **2010 to the present date**. *Medtronic Sofamor Danek, Inc.,* 229 F.R.D. at 554-55 (finding requesting parties' failure to limit its request by date weighed in favor of them bearing cost of production). It is difficult to see how Walgreens would uncover any discoverable information during years (2010-2012, 2020-2022) when Magellan was not even working with the State, much less critical information. It is likewise difficult to understand the marginal utility of requesting information for four years of the contract period (2013, 2017-2019) when the Plaintiffs are not alleging that Walgreens' submitted false claims.

While Walgreen's ultimately agreed to limit this time frame to October 1, 2014 to December 31, 2016 for prior authorization custodians and to October 1, 2014 to present for

---

[8] Magellan has already provided training material and claims notes to the State, which are far more likely to answer these questions.

06337012.1                                            11

Case 2:21-cv-00080-JRG-CRW   Document 100   Filed 03/09/22   Page 11 of 17   PageID #: 1660

corporate-level custodians, it only did so after Magellan incurred the cost of ingesting and hosting an expansive amount of potentially irrelevant data. The number of custodians and the date range for the search is crucial as this determines how much data Magellan's vendor must ingest and process. Data volume drives ESI cost far more than searching. Although Magellan raised concerns about the overly broad time-frame and advised that the prior authorization custodians work almost exclusively in Magellan's FirstTrax claims system (which had been produced), Walgreens initially insisted that Magellan process the emails for all 61 prior authorization custodians for the time-frame requested. Although Walgreens has now tentatively agreed to limit the number of prior authorization custodians (17 total) as well as the relevant time-frame, the costs going forward will still be significant.

### 2. Much of the disputed requested ESI is available from the State and Walgreens has had to push to get it from Magellan because the State has yet to provide it.

A meaningful amount of the ESI Walgreens has requested from Magellan involves communications between Magellan and the State, particularly ESI regarding Magellan's communications regarding the relevant investigations and prior authorization criteria. *See* Motion to Compel, Doc. 45, 45-1 (Request Nos. 18 – 20). The State should have these communications given that most (if not all) would include TennCare employees, but the State has yet to make its ESI (e-mail) production. If Walgreens seeks to obtain ESI from Magellan that should be equally available to the State, this supports cost shifting.

### 3. The parties had no incentive prior to Court intervention to control cost and did not make it possible for Magellan to do so.

Absent cost shifting the parties had no incentive to control costs or make it possible for Magellan to do so, and this factor weighs in favor of cost shifting. To date, the State and Walgreens have refused to commit to pay Magellan's costs, and have conducted discovery as if they will

06337012.1                                12

never have to do so. As an example, although Walgreens' RFPs were issued to the State, the State never negotiated the number of Magellan custodians (69), time frame for the searches, or search terms. The State never told Magellan that it did not plan to do so, and Magellan understood that negotiations were ongoing. By the time that Magellan learned during the December 20, 2021 meet and confer that there had been no negotiation, Magellan had lost valuable time to negotiate and faced a resistant Walgreens concerned about time constraints and the lack of production to date. As a further example, Walgreens did not really consider the marginal utility of its request for the mailboxes of 61 prior authorization custodians potentially spanning over twelve years because it was not subpoenaing the data under Rule 45 and had no real incentive to do so. As discussed above, this led to a significant waste of resources. For example, Magellan processed 158GB of data (with a charge per GB) for the first five "priority" prior authorization custodians. The search of that data under the current agreed upon terms returned only 527 documents (including families), and it is unclear if those are even relevant or if relevant add anything to the non-ESI data already produced. *See Wiginton v. CB Richard Ellis, Inc.*, 229 FRD 568, 573 (N.D. Ill. 2004) (discussing requesting party bearing cost when sampling reveals low responsiveness).

### 4. Unlike the parties, Magellan receives no benefit from the requested discovery.

Magellan is a disinterested party and this weighs in favor of cost shifting. The requested discovery may help Walgreens defend the claims against it. If Magellan produces certain ESI, the State may be relieved of its obligations to do so. If Plaintiffs successfully prosecute their case or obtain a settlement, Plaintiffs will financially benefit. But producing the discovery will not benefit Magellan in any way. Magellan is not even a current contractor for the State and its former contract does not require Magellan to provide discovery assistance much less absorb discovery expenses in a lawsuit in which it is not involved. *See* Plaintiffs' Response to Motion to Compel, Doc. 50, pg.

06337012.1                                13

Case 2:21-cv-00080-JRG-CRW   Document 100   Filed 03/09/22   Page 13 of 17   PageID #: 1662

4-6 (addressing absence of a contractual obligation on the part of Magellan to provide discovery assistance following contract termination).

### 5. Even though Walgreens is now finally negotiating, costs will still be significant.

Magellan and Walgreens have finally begun to make headway on narrowing the scope of discovery due to this Court's intervention. Walgreens is working with Magellan to add limiting criteria to several search terms and to reduce the date range for the searches. Walgreens has also agreed to a technology-assisted review process that will continuously prioritize review of search term hits most likely to be responsive, in order to save the time and expense of reviewing each and every search term hit. Although these modifications will substantially reduce future costs, the projected total vendor expense remains significant (between $148,826.98 and $167,674.98). Collins Decl. at ¶ 10. This weighs in favor of cost shifting.

### 6. The State is the responding party and by default should bear some cost.

The State's refusal to pay to date also supports cost shifting. Walgreens requested the emails at issue from the State; the State is the responding party. *See Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. at 358 (holding generally responding party bears costs). Magellan has only been directed to produce the requested emails because of its former relationship with State, and Magellan has only been reluctant to do so without limitation because its prior contract with the State (unlike some negotiated contractor contracts) does not require Magellan to bear *any* costs of post contract litigation production. If the State did not wish to bear the cost of producing documents created by Magellan in litigation as the responding party, it should have addressed this issue by contract. A non-party, like Magellan, who has "no interest in a litigation should not be required to subsidize the costs of a litigation," absent some negotiated obligation to do so. *Broussard v.*

*Lemmons*, 186 F.R.D. 186, 398 (W.D. La. 1999) (addressing documents sought from non-party pursuant to a Rule 45 subpoena).

### B. The Court Should Cap Magellan's Costs and Allocate All Further Cost to Either the State of Tennessee or Walgreens

The Court should cap Magellan's cost at a set amount to encourage the Walgreens and the State to conduct discovery efficiently and thoughtfully. Magellan proposes $62,000. A $62,000 cap is a reasonable amount to avoid undue burden on Magellan and is practical as it roughly equates to the expense Magellan has already incurred. Magellan's proposed contribution of $62,000, which excludes its Maynard Cooper & Gale attorneys' fees, which have been significant, Collins Decl. at ¶ 10, also represents 35-40% of the projected total expense for the ESI production – a production which solely benefits the parties. The court should allocate all further costs beyond $62,000 to either the State or Walgreens. Magellan has no interest in which party covers further costs associated with ESI.

### C. Magellan's Request is Timely

Although Magellan has already begun processing ESI and has already incurred cost, its request to shift cost is timely. While the Federal Rules typically contemplate that requests to shift cost under Rule 26 will be filed prior to compliance, the Court has wide discretion to be as inventive as necessary to protect parties in the discovery process and may shift cost, before, during, or after production. *See, e.g., United States v. Columbia Broadcasting System, Inc.*, 666 F.2d 364, 370-371 (9th Cir. 1982) (holding non-party did not have to refuse to comply in order to seek reimbursement and district court could have awarded post-compliance reimbursement under Rule 26). Here, mid-production cost shifting is necessary to protect Magellan because of Magellan's unique non-party status as the State's former PBA with no contractual obligation to assist the State with discovery. Magellan raised the issue of costs with the State as soon as the parties requested

that it produce documents, like ESI, that were not addressed by its contract with the State. Magellan could not file a Motion to Quash because it was not subject to its own subpoena. It had to rely on the State to advocate on its behalf. By the time Magellan received custodians and search terms, the parties were already at the Motion to Compel stage. So, Magellan reluctantly began expending cost to upload and host data as it negotiated and sought to find the proper mechanism to address the Court. Magellan was only able to begin advocating for itself and reducing its cost when the Court pulled Magellan into the case directly following Walgreen's Motion to Compel. Since that time Magellan has vigorously asserted its cost concerns to the Court and Walgreens as well as to the State. The Court rightly recognized this fact in holding that Magellan would not waive its arguments for costs if it continued to negotiate with Walgreens in good faith and began production efforts. *See* Order, Doc. 97, at 3-4.

## CONCLUSION

Magellan is more than willing to provide ESI to the State for production to Walgreens in response to Walgreens RFPs subject to continued reasonable negotiation regarding scope; however, Magellan maintains that forcing it to bear the entire cost of doing so would be an undue burden. Magellan requests that the Court cap its costs to respond to Walgreens' RFPs to the Plaintiffs at $62,000, and allocate all further ESI vendor costs between the parties.

Respectfully submitted this 8th day of March, 2022.

                */s/ John David Collins*
                John David Collins (admitted PHV)
                Erica Williamson Barnes (admitted PHV)
                *Attorneys for Non-Party Magellan Medicaid Administration, Inc.*

OF COUNSEL:

MAYNARD, COOPER & GALE, P.C.
1901 Sixth Ave. North, Suite 1700
Birmingham, AL 35203
Telephone: 205.254.1000
Fax: 205.254.1999

## CERTIFICATE OF SERVICE

      I hereby certify that on March 8, 2022, the Clerk of Court was required to filed copies of the foregoing Motion to Allocate Costs and its attachments. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's electronic filing system.

      */s/ John David Collins*
      **OF COUNSEL**