UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and STATE OF TENNESSEE, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 2:21-CV-00080-JRG-CRW |
| WALGREEN COMPANY, | ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Walgreen Company's Motion to Dismiss Counts I–VI of Plaintiffs' Complaint [Doc. 16], Walgreen's Memorandum of Law in Support [Doc. 17], Plaintiffs' Response [Doc. 32], and Walgreen's Reply [Doc. 39]. For the reasons herein, the Court will deny Walgreen's motion.

## I.    BACKGROUND

Plaintiffs United States of America and State of Tennessee allege that Amber Reilly, whom Defendant Walgreen Company formerly employed as a registered store manager in its pharmacy in Kingsport, Tennessee, defrauded them by submitting false or fraudulent claims for prescription medications to TennCare, the program under which Tennessee participates in the federal Medicaid program. [Compl., Doc. 1, ¶¶ 1–4, 39–88]. According to Plaintiffs, Ms. Reilly, while acting in her capacity as Walgreen's manager in Kingsport, knowingly falsified the medical records and lab reports of sixty-five TennCare enrollees. [*Id.* ¶¶ 43–45]. She then submitted these falsified records and lab reports to TennCare so that these enrollees would be eligible for high-cost prescription drugs used to treat Hepatitis C. [*Id.* ¶¶ 46–54].

Relying on these false records, TennCare allegedly approved the Kingsport pharmacy's request for these drugs and continued to approve them for more than two years, from October 2014 through December 2016. [*Id.* ¶¶ 46–47]. During this timeframe, the pharmacy allegedly reaped "staggering revenue increases . . . from payments by TennCare . . . for Hepatitis C medications." [*Id.* ¶ 76].[1] Specifically, Plaintiffs allege that the pharmacy's revenue ballooned by 673 percent from October 2014 through December 2016. [*Id.* ¶¶ 75–77]. Ninety-two percent of that revenue—a sum that exceeded $30,000,000 in payments—allegedly came from Hepatitis C drugs. [*Id.* ¶ 77]. Of those payments, roughly $8,000,000 allegedly came from TennCare, and roughly $5,930,000 were payments that TennCare allegedly made to fill prescriptions for the enrollees whose records and reports Ms. Reilly falsified. [*Id.*].

In late 2016, Ms. Reilly was eventually charged in this Court with healthcare fraud, in violation of 18 U.S.C. §§ 1347 and 2, and pleaded guilty. [Plea Agreement, Doc. 2, No. 2:16-CR-00107-JRG]. Plaintiffs allege that, around this same time, Walgreen had knowledge that it had received overpayments from Ms. Reilly's fraudulent conduct and that it had an obligation to reimburse TennCare for those overpayments. [Compl. ¶¶ 85–86]. Plaintiffs cite several bases for Walgreen's knowledge:

- Defendant became aware of Ms. Reilly's fraud as early as June 2016 and was on notice that it had received payments based on false statements and documents submitted and that it ha[d] an obligation to reimburse TennCare for such overpayments.

- On or about June 8, 2016 and June 14, 2016, the Tennessee Bureau of Investigation served Defendant with subpoenas seeking records related to prescriptions filled for certain patients and claims and records submitted to TennCare for those patients.

- On June 15, 2016, Defendant's loss prevention personnel went to the Kingsport Pharmacy to investigate and recovered records that had been altered. The loss

---

[1] Plaintiffs allege that Ms. Reilly received an annual performance-based bonus of up to $25,000. [Compl. ¶ 79].

prevention personnel also spoke to an employee of Defendant who worked at the direction of Ms. Reilly, and the employee admitted to falsifying several prior authorization records at the direction of Ms. Reilly.

- In October 2016, Ms. Reilly pleaded guilty to one count of healthcare fraud relating to at least 51 Hepatitis C patients that failed to meet TennCare eligibility requirements. Specifically, Ms. Reilly admitted that, in her role as a clinical pharmacy manager, she falsified (and directed at least one other employee to falsify) prior authorizations, medical lab reports, and drug test results so that otherwise unqualified Hepatitis C patients would satisfy TennCare's payment eligibility criteria. Accordingly, Defendant was on notice by October 2016 that it had received payments from TennCare based on false and fraudulent claims for at least 51 TennCare beneficiaries, and that it had an obligation to reimburse TennCare for overpayments.

- Further, on or about September 28, 2017, representatives of the United States and the State of Tennessee made Walgreen aware, through its counsel, of overpayments for up to 14 additional TennCare beneficiaries.

[*Id.* ¶¶ 81–85]. To date, however, more than five years after Ms. Reilly's guilty plea, Walgreen has allegedly made no attempt to return the overpayments to TennCare. [*Id.* ¶ 86].

Now, Plaintiffs have brought this civil suit against Walgreen in this Court, alleging that it financially benefited from Ms. Reilly's fraudulent conduct and has made no attempt to refund the illicit proceeds that it received. [*Id.* ¶¶ 44, 86]. Plaintiffs claim that Walgreen violated the False Claims Act, 31 U.S.C. § 3729, *et seq.* (Counts One, Two, and Three) and the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.* (Counts Four, Five, and Six). [*Id.* ¶¶ 89–106]. Plaintiffs also claim that Walgreen is liable under common law theories of payment by mistake of fact and unjust enrichment. [*Id.* ¶¶ 107–14]. Walgreen now moves for the dismissal of all claims under the False Claims Act and the Tennessee Medicaid False Claims Act. Having carefully reviewed and considered the parties' arguments, the Court is now prepared to rule on Walgreen's motion.

## II. Legal Standard

Under Federal Rule of Civil Procedure 8(a)(2), "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the plaintiff's complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the plaintiff pleads facts that create a reasonable inference that the defendant is liable for the alleged conduct in the complaint. *Id.*

When considering a motion to dismiss under Rule 12(b)(6), the Court must accept the allegations in the complaint as true and construe them in a light most favorable to the plaintiff. *Mixon v. Ohio*, 193 F.3d 389, 400 (6th Cir. 1999). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," however. *Iqbal*, 556 U.S. at 678. The allegations must consist of more than "labels," "conclusions," and "formulaic recitation[s] of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (citation omitted); *see Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." (citation omitted)).

## III. Analysis

"As the [False Claims] Acts' name suggests, liability under the Act often arises for the submission of false claims to the government." *U.S. ex rel. Harper v. Muskingum Watershed Conservancy Dist.*, 842 F.3d 430, 433 (6th Cir. 2016) (citing 31 U.S.C. § 3729(a)(1)(A)–(B)). The United States brings two claims against Walgreen for allegedly submitting false claims to the United States, one claim under 31 U.S.C. § 3729(a)(1)(A) and one claim under 31 U.S.C.

§ 3729(a)(1)(B).[2] Under § 3729(a)(1)(A), a "person"[3] who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" is "liable to the United States." 31 U.S.C. § 3729(a)(1)(A). Under § 3729(a)(1)(B), a "person" who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" is "liable to the United States." *Id.* § 3729(a)(1)(B). The term "knowingly" means a person's (1) "actual knowledge of," (2) "deliberate ignorance of the truth or falsity of," or (3) "reckless disregard for the truth or falsity of the information" at issue in the alleged false claims. *Id.* § 3729(b)(1)(A)(i)–(iii). A claim under § 3729(a)(1)(A) or § 3729(a)(1)(B) is known as a "direct false claim" because it "cause[s] the United States to remit money directly to claimants." *U.S. ex rel. Landis v. Tailwind Sports Corp.*, 160 F. Supp. 3d 253, 255 (D.D.C. 2016) (citations omitted).

The United States also brings one claim against Walgreen for allegedly retaining the fraudulent proceeds. Under § 3729(a)(1)(G), a "person" who (1) "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government" or (2) "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government" is "liable to the United States." 31 U.S.C. § 3729(a)(1)(G). A claim under § 3729(a)(1)(G) is known as a "reverse false claim," *Harper*, 842 F.3d at 433, because it "reverse[s] the typical claim under the Act: instead of creating liability for wrongfully *obtaining* money from the government, the reverse-false-claims provision creates liability for wrongfully *avoiding* payments that should

---

[2] Although Ms. Reilly's fraudulent conduct specifically resulted in improper TennCare payments rather than improper Medicaid payments, TennCare is a joint state-federal program. In other words, the State of Tennessee participates in Medicaid through TennCare, and the United States provides funding for TennCare. 42 U.S.C. §§ 1396a–1396b.

[3] "While § 3729 does not define the term 'person,'" the Supreme Court has "held that its meaning has remained unchanged since the original [False Claims Act] was passed in 1863," and "[t]here is no doubt that the term then extended to corporations." *Cook County v. U.S. ex rel. Chandler*, 538 U.S. 119, 125 (2003) (citation omitted).

have been made to the government," *U.S. ex rel. Barrick v. Parker-Migliorini Int'l, Inc.*, 878 F.3d 1224, 1226 (10th Cir. 2017). The term "knowingly" means a person's (1) "actual knowledge of," (2) "deliberate ignorance of the truth or falsity of," or (3) "reckless disregard for the truth or falsity of" the fact that he has a legal obligation to return overpayments to the United States. 31 U.S.C. § 3729(b)(1)(A)(i)–(iii).

A defendant who violates § 3729(a)(1)(A), (a)(1)(B), or (a)(1)(G) is liable to the United States for a civil penalty between $5,000 and $10,000 for each violation, costs, and treble damages, though courts may reduce treble damages to double damages for a cooperative defendant. *Id.* § 3729(a)(1)–(3); *but see* 28 C.F.R. § 85.5 (increasing the civil penalties for violations that occurred after November 15, 2015). The Supreme Court has described the False Claims Act's treble-damages provision as "essentially punitive in nature." *Vt. Agency of Natural Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 784 (2000).

In pursuing dismissal of the United States' claims, Walgreen basically raises a two-fold argument. First, it maintains that the United States is seeking to hold Walgreen liable for Ms. Reilly's actions by relying on a theory of vicarious liability, which, it argues, is not cognizable under the False Claims Act. [Def.'s Mem. at 7–14]. The United States does not challenge Walgreen's assertion that it is relying on a theory of vicarious liability but does challenge its assertion that Walgreen cannot be vicarious liability for Ms. Reilly's actions under the False Claims Act. [United States' Resp. at 12–23]. Second, Walgreen contends that the United States' claims suffer from fatal shortcomings under Federal Rule of Civil Procedure 9(b)'s heightened pleading standard. [Def.'s Mem. at 14–24].

Both parties agree that the False Claims Act is co-extensive with the Tennessee Medicaid False Claims Act, so the Court will begin and end its analysis with the United States' claims

under the False Claims Act. *See* [*id.* at 24 ("Plaintiffs' TMFCA claims fail for the same reasons their federal FCA claims do. '[A]n inquiry under the TMFCA is substantially the same' as an inquiry under the federal FCA; 'therefore, the [federal] FCA analysis also applies to Plaintiff[s'] claims under the TMFCA.'" (quoting *U.S. ex rel. Lane v. Murfreesboro Dermatology Clinic, PLC*, No. 4:07–cv–4, 2010 WL 1926131, at *4 n.1 (E.D. Tenn. May 12, 2010)))]; [United States' Resp. at 4 ("The provisions of the Tennessee Medicaid False Claims Act (TMFCA) are substantially identical." (citing Tenn. Code Ann. § 71-5-182(a)(1)(A), (B), (D)))].

## A. Vicarious Liability

Under the doctrine of vicarious liability, a principal, such as a corporation, is financially responsible for the wrongful conduct of its agent, such as an employee, even though it did not itself commit the wrongful act. "The purpose of vicarious liability in agency law is to place the burden of liability for conduct on the party that is in the best position to avoid that liability." Daniel Allen & Mindy Haverson, *An Alternative Approach to Vicarious Liability for Int'l Accounting Firm Networks*, 15 Stan. J. L. Bus. & Fin. 426, 440 (2010). Three types of vicarious liability exist in common law. First, a principal may be vicariously liable for an agent's wrongful conduct when it expressly or implicitly authorizes that conduct. *Jones v. Federated Fin. Reserve Corp.*, 144 F.3d 961, 965 (6th Cir. 1998). Second, a principal may be vicariously liable when the agent acts within the scope of her employment for the principal's benefit. *Id.*

Third, a principal may be vicariously liable when an agent acts with apparent authority and a third party relies on that apparent authority. *Id.* In other words, vicarious liability is "based upon the fact that the agent's position facilitates the consummation of the fraud, in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him." *Am. Soc. of Mech. Eng'rs v.*

7

*Hydrolevel Corp.*, 456 U.S. 556, 566 (1982) (quotation and citation omitted). The United States relies on an apparent-authority theory of vicarious liability to hold Walgreen liable for Ms. Reilly's conduct, [United States' Resp. at 17–23]—a theory that "has long been the settled rule in the federal system," *Am. Soc. of Mech. Eng'rs*, 456 U.S. at 567 (citation omitted).

In disputing the issue of whether a company can be vicariously liable for its employee's actions under the False Claims Act, the parties agree that neither the Supreme Court nor the Sixth Circuit has addressed this issue. [Def.'s Mem. at 9 n.2; United States' Resp. at 16]; *see generally U.S. ex rel. Baker v. Rehab. Specialists of Livingston Cty., Inc.*, No. 00-74410, 2008 WL 3834106, at *3 n.5 (E.D. Mich. Aug. 13, 2008) ("[T]his is unchartered territory in Sixth Circuit law. There is no precedent regarding the vicarious liability of an employer under the FCA in this Circuit." (citation omitted)). In lieu of binding precedent from either the Supreme Court or Sixth Circuit, Walgreen exhorts the Court to analogize to and adopt the Supreme Court's reasoning in *Kolstad v. American Dental Association*, 527 U.S. 526 (1999), a case in which the Supreme Court did not address the False Claims Act at all. [Def. Mem. at 8–9].

In *Kolstad*, the Supreme Court considered whether Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, allowed a plaintiff to recover punitive damages under a theory of vicarious liability, i.e., by showing that an employer is vicariously liable for a managerial agent's discriminatory acts. Section 1981a, the statutory provision at issue in *Kolstad*, allows a plaintiff to recover punitive damages for intentional discrimination, 28 U.S.C. § 1981a(a)(1), though the plaintiff must demonstrate "that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual," *id.* § 1981a(b)(1). The Supreme Court held that "an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents

where these decisions are contrary to the employer's 'good-faith efforts to comply with Title VII.'" *Kolstad*, 527 U.S. at 545 (quotation omitted).

In reaching this holding, the Supreme Court reasoned that, although principles of agency apply to actions under Title VII, *id.* at 541, an award of punitive damages against an employer under a theory of vicarious liability is contrary to Title VII's purpose, *id.* at 544–46. Specifically, the Supreme Court recognized that Title VII's "'primary objective' is 'a prophylactic one'" in that "it aims, chiefly, 'not to provide redress but to avoid harm'" by "motivat[ing] employers to detect and deter Title VII violations." *Id.* at 545, 546 (alteration in original) (quotations omitted). If an employer can be liable under a "'scope of employment' rule in the Title VII punitive damages context" for managerial decisions that "are contrary to the employer's 'good-faith efforts to comply with Title VII,'" then the employer might not even bother to make good-faith efforts to prevent discrimination in the workplace to begin with. *Id.* at 545–46 (quotations omitted); *see id.* at 545 ("Dissuading employers from implementing programs or policies to prevent discrimination in the workplace is directly contrary to the purposes underlying Title VII.").

So in sum, *Kolstad* permits a plaintiff to pursue punitive damages against an employer under a theory of vicarious liability only when a managerial agent "engaged in a discriminatory practice" with "malice or with reckless indifference to the [plaintiff's] federally protected rights" *and* the plaintiff, through evidence, is able to impute that malice or recklessness to the employer itself. 28 U.S.C. § 1981a(b)(1); *see Kolstad*, 527 U.S. at 546 (remanding the case for a finding as to "whether petitioner can identify facts sufficient to support an inference that the requisite mental state," i.e., malice or recklessness, "can be imputed to respondent"); *see generally id.* at 544 ("Where an employer has undertaken such good faith efforts at Title VII

9

compliance, it 'demonstrat[es] that it never acted in reckless disregard of federally protected rights.'" (alteration in original) (quotation omitted)); *id.* (noting that "the institution of a written sexual harassment   policy goes a long way towards dispelling any claim about the employer's 'reckless' or 'malicious' state of mind" (quotation omitted)).

According to Walgreen, *Kolstad* precludes the United States from "impos[ing] punitive liability on a vicarious basis" under the False Claims Act. [Def.'s Mem. at 8]. In Walgreen's view, *Kolstad* requires this Court to hold that "a company cannot be vicariously liable under the FCA unless a plaintiff can show that the company itself recklessly disregarded the 'truth or falsity of the information' at issue in the purportedly false claims." [*Id.* at 9 (quoting 31 U.S.C. § 3729(b)(1)(A)(iii))]. "The acts of a single employee, done with scienter," Walgreen asserts, "are insufficient absent evidence that the company itself shared the employee's state of mind." [*Id.*].

In response, the United States maintains that *Kolstad* is "irrelevant" because "it was decided in the context of Title VII, not the FCA." [United States' Resp. at 12]; *see U.S. ex rel. Shackelford v. Am. Mgmt., Inc.*, 484 F. Supp. 2d 669, 676 (E.D. Mich. 2007) ("Despite [the defendant's] arguments to the contrary, the holding in *Kolstad* with regard to Title VII actions does not translate to FCA actions."); *U.S. ex rel. Bryant v. Williams Bldg. Corp.*, 158 F. Supp. 2d 1001, 1008 (D.S.D. 2001) ("Because the Supreme Court's modification of the scope of employment rule was compelled by concerns unique to Title VII, this Court is not convinced that the *Kolstad* decision has any bearing upon the application of agency principles in the context of the FCA."); *cf. U.S. ex rel. Vavra v. Kellogg Brown & Root, Inc.*, 727 F.3d 343, 353 (5th Cir. 2013) ("We see no cause in [the Anti-Kickback Act] to stretch *Kolstad*'s holding expansively, as [the defendant's] position requires." (citing *id.*)); *but see United States v. S. Md. Home Health*

10

*Servs. Inc.*, 95 F. Supp. 2d 465, 471, 473 (D. Md. 2000) ("The rationale in *Kolstad* . . . should be applied here because the recovery sought by the Government in this case is similar in nature to a claim for punitive damages. Accordingly, in light of *Kolstad,* [the defendant] is not liable under the FCA unless the Government can prove that [the defendant] authorized, ratified or acted with knowledge of or reckless indifference to [the agent's] misdeeds.").[4]

The United States has the superior argument. The Supreme Court long ago warned that "[t]ranslation of an implication drawn from the special aspects of one statute to a totally different statute is treacherous business," *Fed. Trade Comm'n v. Bunte Bros.*, 312 U.S. 349, 353 (1941), and Walgreen's contention that *Kolstad*, a case that dealt exclusively with Title VII of the Civil Rights Act, "*requires* th[e] conclusion" that "vicarious liability is unavailable under the FCA" is therefore a dubious one, [Def.'s Mem. at 8 (emphasis added)]. Walgreen is too dismissive of the markedly distinct purposes of Title VII and the False Claims Act. They are not bedfellows. Title VII's fundamental purpose is forward-looking, i.e. "not to provide redress but to avoid harm," *Kolstad*, 527 U.S. at 545 (quotation omitted), whereas the False Claims Act's principal purpose is backward-looking, i.e., "to provide for restitution to the government of money taken from it by fraud," *U.S. ex rel. Augustine v. Century Health Servs., Inc.*, 289 F.3d 409, 413 (6th Cir. 2002) (quotation omitted); *see U.S. ex rel. Marcus v. Hess*, 317 U.S. 537, 551 (1943) ("We think the chief purpose of the [False Claims Act] here was to provide for restitution to the government of

---

[4] The United States points out that several courts have rejected *Southern Maryland Home Health Services* as unsound precedent. *See, e.g.*, *United States v. Dental Dreams, LLC*, 307 F. Supp. 3d 1224, 1242 (D.N.M. 2018) ("[T]his Court is not convinced that the *Southern Maryland* court's reasoning remains sound. Moreover, the district court in *Southern Maryland* acknowledged the considerable authority that then-existed in the FCA context imposing vicarious liability on employers, even if the employee's actions did not benefit the employer, when the employee is acting within the scope of employment or with apparent authority."); *U.S. ex rel. Fago v. M & T Mortg. Corp.*, 518 F. Supp. 2d 108, 125 (D.D.C. 2007) ("*Southern Maryland Home Health Services*, which was never appealed, has been criticized and goes against the great weight of authority in FCA cases." (citations omitted)); *Shackelford*, 484 F. Supp. 2d at 676 ("As to the decision in *Southern Maryland*, which relied in large part on *Kolstad*, the Court simply disagrees with its reasoning.").

11

money taken from it by fraud[.]"); *see also* H.R. Rep. No. 99–660, at 18 (1986) ("[T]he False Claims Act . . . is used as the primary vehicle by the Government for recouping losses suffered through fraud.").

In addition, Title VII's purpose is to protect private citizens from discrimination in the workplace, *Kolstad*, 527 U.S. at 545, whereas the False Claims Act's purpose is to protect the property of the United States Government from fraud, *Rainwater v. United States*, 356 U.S. 590, 592 (1958). A statute whose purpose is to protect private citizens and a statute whose purpose is to protect the United States Government simply do not hold analogous value to each other. *See McNally v. United States*, 483 U.S. 350, 358 n.8 (1987) ("'[A] statute which . . . has for its object the protection of the individual property rights of the members of the civic body, is one thing; a statute which has for its object the protection and welfare of the government alone . . . [is] quite another.'" (quotation omitted)).

So in deciding whether Walgreen can be vicariously liable for Ms. Reilly's actions under the False Claims Act, the Court cannot cleave to a case—*Kolstad*—that concerned a different statute with a different purpose from the False Claims Act. The False Claims Act's purpose is *essential* to the Court's analysis, because when a statute like the False Claims Act "does not directly address vicarious liability," the Court must "look to the statute's purposes for guidance in determining whether to interpret [its] words to include liability based on the apparent authority of an employee." *Jones*, 144 F.3d at 964 (citations omitted); *see Am. Soc. of Mech. Eng'rs*, 456 U.S. at 570 ("We hold that the apparent authority theory is consistent with the congressional intent [in the statute] to encourage competition."). Again, the False Claims Act's main purpose is to provide restitution to the United States when it is the victim of fraud, and it "was intended to reach *all* types of fraud, *without qualification*, that might result in financial loss to the

12

Government." *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968) (emphasis added) (footnote omitted).

In a case like this one—in which the United States alleges that Ms. Reilly committed unimpeded fraud while acting in her capacity as Walgreen's store manager[5] and that Walgreen received all the fraudulent proceeds—the Court struggles to fathom how the False Claims Act can realize its purpose of reaching these proceeds and providing restitution to the United States without vicarious liability. *See Jones*, 144 F.3d at 966 (recognizing that a corporation "can only act through its agents" and stating that, without this principle of agency law, "it is difficult to imagine a situation in which a company would ever be found to have willfully violated the statute directly"). Walgreen strenuously maintains that it never knew of Ms. Reilly's fraudulent actions while they were taking place, [Def.'s Mem. at 7], but even so, the fraudulent proceeds— to which Walgreen has no right of possession—now allegedly lie in Walgreen's very pockets. Without a theory of vicarious liability, how then is the United States to recoup these proceeds, which the False Claims Act so readily aims to restore to its rightful owner?

Walgreen appears to argue the United States could simply pursue a recoupment action under state law. [*Id.* at 17–18]. But this argument flouts a second purpose of the False Claims Act: deterrence. *See Sanders v. Allison Engine Co.*, 703 F.3d 930, 948 (6th Cir. 2012) (stating that the False Claims Act "does have some deterrent effects" and has "become the primary means

---

[5] Walgreen argues that, "[b]y any definition, Reilly was not a 'high level' official given that she managed just one of the thousands of Walgreens pharmacies across the nation," [Def.'s Reply at 5], but whether Ms. Reilly, for purposes of a principal-agent relationship, served in a managerial capacity is a question of fact, *see Kolstad*, 527 U.S. at 543 ("'Unfortunately, no good definition of what constitutes a "managerial capacity" has been found,' and determining whether an employee meets this description requires a fact-intensive inquiry." (internal quotation and quotation omitted)). The Court cannot resolve questions of fact at the pleading stage. *See Ecclesiastical Order of the ISM of AM, Inc. v. IRS*, 725 F.2d 398, 403 (6th Cir. 1984) (Jones, J., concurring in part and dissenting in part) (stating that "the court is not to resolve issues of fact in the context of a motion to dismiss"); *Mike Vaughn Custom Sports, Inc. v. Piku*, 15 F. Supp. 3d 735, 753 (E.D. Mich. 2014) ("The Court cannot resolve questions of fact on a motion to dismiss." (citations omitted)).

13

by which the Government combats and deters fraud" (quotation omitted)). In a recoupment action, all would essentially be forgiven once a corporation returns stolen funds to the United States. What, then, is to discourage that corporation, or any other corporation, from attempting to defraud the United States in the future? The answer is, nothing, and the treble-damages provision exists, at least in part, for this very reason. *Id.*

Under this case's facts, vicarious liability is not only consistent with the False Claims Act's goals but also necessary to effect its broad objective to "reach all types of fraud, without qualification." *Neifert-White*, 390 U.S. at 232; *see Rainwater*, 358 U.S. at 592 ("It seems quite clear that the objective of Congress was *broadly* to protect the funds and property of the Government from fraudulent claims." (emphasis added) (citation and footnote omitted)); *cf. Jones*, 144 F.3d at 964 ("Because application of the apparent authority doctrine advances the [Fair Credit Reporting Act's] goals and produces no inconsistencies with [its] other [statutory] provisions, we conclude that such a theory of liability is an appropriately operative theory of liability under the statute."); *In re Atlantic Fin. Mgmt., Inc.*, 784 F.2d 29, 32–33 (1st Cir. 1986) (concluding that the Securities Exchange Act allows for vicarious liability because of its broad statutory language and legislative purpose).

In addition, under this case's facts, the False Claims Act's purpose is in harmony with general principles of agency. *See Am. Soc. of Mech. Eng'rs*, 456 U.S. at 566 ("[A] principal is liable for an agent's misrepresentations that cause pecuniary loss to a third party, when the agent acts within the scope of his apparent authority." (citations omitted)). And when the Court turns to the False Claims Act's statutory provisions, they are in symmetry with its view that the False Claims Act supports a theory of vicarious liability. *See generally Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 609 (1979) ("As in all cases of statutory construction, our task is to

14

interpret the words of these statutes in light of the purposes Congress sought to serve."). Section 3729 repeatedly uses the word "person," and as Justice Breyer once astutely observed, "[f]ederal courts on occasion have interpreted the word 'person' or the equivalent in other statutes as authorizing forms of vicarious liability." *Bd. of Cty. Comm'r's of Bryan Cty. v. Brown*, 520 U.S. 397, 432–33 (1997) (Breyer, J., dissenting) (citing *Am. Soc. of Mech. Eng'rs*, 456 U.S. at 573 n.11; *United States v. A & P Trucking Co.*, 358 U.S. 121, 124–125 (1958); *Am. Tel. and Tel. Co. v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1429–1434 (3d Cir. 1994), *cert. denied*, 514 U.S. 1103 (1995))).

Finally, inter-circuit case law buttresses the Court's conclusion that vicarious liability is permissible under the False Claims Act. *See United States v. O'Connell*, 890 F.2d 563, 568 (1st Cir. 1989) ("We hold that a corporation should be held liable under the False Claims Act for the fraud of an agent who acts with apparent authority even if the corporation received no benefit from the agent's fraud."); *Grand Union Co. v. United States*, 696 F.2d 888, 891 (11th Cir. 1983) ("We have held in cases brought under the False Claims Act that the knowledge of an employee is imputed to the corporation when the employee acts for the benefit of the corporation and within the scope of his employment." (footnote and citations omitted)); *United States v. Hangar One*, 563 F.2d 1155, 1158 (5th Cir. 1977) ("[A] corporation will be liable for violations of the False Claims Act if its employees were acting within the scope of their authority and for the purpose of benefitting the corporation."); *Bryant*, 158 F. Supp. 2d at 1008 ("[T]he Court is guided by the majority of cases which hold a principal liable whenever its agent acts within the scope of employment or with apparent authority, regardless of the principal's knowledge, culpability, policies, or efforts to restrain the employee's bad acts." (citations omitted)); *United States v. Inc. Vill. of Island Park*, 888 F. Supp. 419, 438 (E.D.N.Y. 1995) (concluding that the

defendant's acts "can form the basis for . . . liability under the False Claims Act" because they "were within the scope of his actual authority and, under principles of respondeat superior, can form the basis for the [corporation's] liability under the False Claims Act); *see also Am. Biomaterials Corp. v. United States*, 954 F.2d 919, 926 (3d Cir. 1992) (stating that the First Circuit's decision in *O'Connell* is "consistent with" the Supreme Court's precedent).

Also, the United States District Court for the Eastern District of Michigan held in *United States ex rel. Shackelford v. American Management, Inc.*, a published case, that "a principal is vicariously liable whenever its agents act within the scope of their employment or with apparent authority regardless of the employer's knowledge or culpability," and it viewed "[t]his holding [as] consistent with the purpose of the FCA to broadly protect the property of the government." 484 F. Supp. 2d at 676. Walgreen, however, claims that *Shackelford* is shaky precedent because the district court did not acknowledge, as the Supreme Court did in *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, that the False Claims Act's treble-damages provision is "essentially punitive in nature." [Def.'s Mem. at 11 n.4 (quoting *Stevens*, 529 U.S. at 784)]. But in homing in on the False Claims Act's potentially punitive aspects, Walgreen is trying to rekindle its argument that *Kolstad* forecloses "punitive liability on a vicarious basis" under the False Claims Act. [*Id.* at 8]. This argument, for the reasons the Court has already mentioned, is a nonstarter.

And besides, as the United States rightly argues, the Supreme Court, despite having once characterized the False Claims Act's treble-damages provision as "essentially punitive nature" in *Stevens*, has never firmly held that it is strictly punitive. In *Cook County v. United States ex rel. Chandler*, 538 U.S. 119 (2003), the Supreme Court assumed a softer tone when addressing the False Claims Act's treble-damages provision, stating that although it had previously described

16

this provision as "essentially" punitive, "it is important to realize that treble damages have a compensatory side, serving remedial purposes in addition to punitive objectives." *Id.* at 130 (citations omitted); *see Sanders*, 703 F.3d at 948 ("In *PacifiCare Health Systems, Inc. v. Book*, the Supreme Court cited both *Stevens*'s and *Chandler*'s characterizations of the treble damages provision in the FCA, which suggests that the Court does not view the characterization of the treble damages provision set forth in *Stevens* as exclusively authoritative." (internal citation and citation omitted)).

Walgreen, however, clutches to one final argument, pointing out that a separate district judge in the Eastern District of Michigan was skeptical of *Shackelford*, though this is true only to an extent. [Def.'s Mem. at 11 n.4]. In *United States ex rel. Baker v. Rehabilitation Specialists of Livingston County, Inc.*, the United States District Court for the Eastern District of Michigan stated that it "disagree[d]" with *Shackelford* in one regard: "*Shackelford* essentially employs a negligence standard that leaves employers subject to punitive damages for the criminal acts of their employees, and can result in a manifest injustice against employers whose employees act criminally to not only defraud the government, but to defraud their own employer as well." 2008 WL 3834106 at *1 (internal citation omitted). The district court's concern with the "manifest injustice" that punitive liability would have on a corporation that is a victim of its employee's fraud is not a novel concern. "[It is] a well settled limitation on the scope of vicarious liability for an agent's intentional torts where the intentionally tortious or criminal acts of the agent are directed against the corporation itself." *Am. Biomaterials Corp.*, 954 F.2d at 924.

But the specter of manifest injustice that worried the district court in *Baker* simply does not exist in this case. Walgreen is in no way a victim of embezzlement; rather, it is the alleged

beneficiary of Ms. Reilly's fraud.[6] Walgreen allegedly *received*, and still has in its possession, all the fraudulent proceeds. When a corporation, like Walgreen here, benefits from the fraud of a managerial agent who is acting within the scope of her employment, a constellation of courts, including the district court in *Shackelford*, has held that the corporation can be vicariously liable under the False Claims Act. *Grand Union*, 696 F.2d at 891; *Hangar One*, 563 F.2d at 1158; *Shackelford*, 484 F. Supp. 2d at 676; *Bryant*, 158 F. Supp. 2d at 1008; *Vill. of Island Park*, 888 F. Supp. at 438.[7] This Court, based on its deliberate and specific analysis of the False Claims Act's purpose, now aligns itself with these courts, but it does so with the caveat that it does not invite other courts to expand its ruling beyond the specific facts of this case, in which Walgreen is the alleged beneficiary of Ms. Reilly's fraud and not itself a victim.

## B. The Factual Sufficiency of Plaintiffs' Complaint

Next, Walgreen requests the dismissal of Plaintiffs' claims by arguing that they lack sufficient factual detail to form direct and reverse false claims, and in making this argument, it relies, in part, on the heightened pleading standard under Rule 9(b). Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake," though "[m]alice, intent, knowledge, and other conditions of a person's mind

---

[6] Walgreen claims that "this Court treated Walgreens as an innocent victim when it sentenced Reilly and detailed the restitution obligation it was imposing on her," [Def.'s Mem. at 1], but Walgreen is not among the victims that the Court listed in its criminal judgment, *see* [J., Doc. 28, at 5, No. 2:16-CR-00107-JRG]. In fact, the Court, in the judgment, intimated that Walgreen was in a position to reimburse the Bureau of TennCare, the lone victim in the case. *See* [*id.* ("If Walgreen Co. reimburses the Bureau of TennCare the $4,398,794.00, then the defendant shall owe $4,398,794.00 in total restitution to Walgreen Co.")].

[7] When contemplating the topic of manifest injustice, however, the Court has to wonder, to the extent that the treble-damages provision has a "compensatory side," *Cook County*, 538 U.S. at 130 (citation omitted), whether the United States and the State of Tennessee can be fairly entitled to compensatory damages in this case. After all, the Court entered a criminal judgment against Ms. Reilly that already includes restitution to the Bureau of TennCare. *Compare United States v. Bailey*, 973 F.3d 548, 576 (6th Cir. 2020) (stating that the purpose of restitution is to make the victim whole again), *with Engel v. Chevron Corp.*, No. 3:96–CV–377, 1996 WL 1687454, at *3 (E.D. Tenn. June 21, 1996) ("[T]he purpose of compensatory damages is to make plaintiffs whole." (quotation omitted)); *see Hess*, 317 U.S. at 551 ("We think the chief purpose of the [False Claims Act] here was to provide for restitution to the government of money taken from it by fraud[.]").

may be alleged generally." To satisfy Rule 9(b), a plaintiff must allege "the time, place and content of the misrepresentations; the defendant's fraudulent intent; the fraudulent scheme; and the injury resulting from the fraud." *Power & Tel. Supply Co. v. SunTrust Banks, Inc.*, 447 F.3d 923, 931 (6th Cir. 2006) (citations omitted). Rule 9(b) applies to claims under the False Claims Act because "because 'defendants accused of defrauding the federal government have the same protections as defendants sued for fraud in other contexts.'" *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 466 (6th Cir. 2011) (quotation omitted).

Although Rule 9(b) allows a plaintiff to plead intent and knowledge in general terms, conclusory assertions as to these states of mind will not suffice "without reference to [a] factual context." *Iqbal*, 556 U.S. at 686. In other words, the pleading requirements under Rule 8(a)(2) are "still operative" and apply to allegations of intent and knowledge. *Id.* (citation omitted); *see also Michaels Bldg. Co. v. Ameritrust Co.*, 848 F.2d 674, 680 (6th Cir. 1988) ("Rule 9(b)'s particularity requirement does not mute the general principles set out in Rule 8; rather, the two rules must be read in harmony." (citation omitted)). A plaintiff therefore may not simply plead "the bare elements of his cause of action, affix the label 'general allegation,' and expect his complaint to survive a motion to dismiss." *Iqbal*, 556 U.S. at 686.

1. <u>Section 3729(a)(1)(A) and (a)(1)(B): The Direct False Claims</u>

In invoking Rule 9(b) to attack the United States' direct false claims, Walgreen, in a one-paragraph argument, relies exclusively on the Restatement (Second) of Agency, under which it maintains that "[c]ritically, conduct within the scope of employment must also be reasonably foreseeable and not 'seriously criminal.'" [Def.'s Mem. at 14]. According to Walgreen, "[n]either is alleged here." [*Id.*]. But whether an act is seriously criminal, and falls outside an employee's scope of employment, is just *one* factor that courts consider in a ten-factor, conjunctive test under

the Restatement. Restatement (Second) of Agency § 229(2)(a)–(j). "An act may," therefore, still "be within the scope of employment although consciously criminal[.]" Restatement (Second) of Agency § 231 (1958); *see Kolstad*, 527 U.S. at 544 ("[A]n employee may be said to act within the scope of employment even if the employee engages in acts 'specifically forbidden' by the employer and uses 'forbidden means of accomplishing results.'" (quotation and citations omitted). By ignoring the other nine factors in this ten-factor test, Walgreen oversimplifies the issue.

In addition, the United States correctly argues that reasonable foreseeability depends on "whether or not the conduct is so unlike that authorized that it is a substantially different thing." [United States' Resp. at 20 (quotation omitted)]; *see* Restatement (Second) of Agency § 229(1) (stating that "[t]o be within the scope of the employment, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized"). The United States specifically alleges that Ms. Reilly, in a managerial capacity, acted within her employment's scope when she committed the fraud, and in keeping with Rule 9(b), it meticulously details her fraudulent conduct. [Compl. ¶¶ 39–88]. Whether Ms. Reilly's acts were "of the same general nature as that authorized" by Walgreen is a "matter[] of fact," Restatement (Second) of Agency § 291(1), (2), which, here at the pleading stage, the Court must decline to address, *see Ecclesiastical Order of the ISM of AM, Inc. v. IRS*, 725 F.2d 398, 403 (6th Cir. 1984) (Jones, J., concurring in part and dissenting in part) (stating that "the court is not to resolve issues of fact in the context of a motion to  dismiss"); *Mike Vaughn Custom Sports, Inc. v. Piku*, 15 F. Supp. 3d 735, 753 (E.D. Mich. 2014) ("The Court cannot resolve questions of fact on a motion to dismiss." (citations omitted)). Walgreen, therefore, makes no headway in showing that the United States' direct false claim fails to satisfy Rule 9(b).

2.  <u>Section 3729(a)(1)(G): The Reverse False Claim</u>

In a final volley against Plaintiffs' complaint, Walgreen argues that the United States has failed to plead sufficient facts to support its reverse false claim under § 3729(a)(1)(G)—an argument in which the United States Chamber of Commerce joins as amicus. *See* [Amicus Br., Doc. 34]. Again, under § 3729(a)(1)(G), a "person" can be liable under two circumstances, when he (1) "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government" or (2) "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). The United States opts for the second approach to liability, pleading that Walgreen "knowingly and improperly avoided an obligation to pay money to the Government." [Compl. ¶ 96]; *see* [Def.'s Mem. at 16 (observing that the "Complaint apparently seeks to proceed on the notion that Walgreens 'knowingly and improperly avoid[ed]' an obligation to return monies to TennCare")]. To state a viable claim, the United States has to allege facts demonstrating that Walgreen (1) "had 'an *obligation* to [pay or] transmit . . . [money]' to the United States; (2) 'improperly avoid[ed]' this obligation; and (3) did so 'knowingly.'" *Harper*, 842 F.3d at 433 (quoting 31 U.S.C. § 3729(a)(1)(G)). Walgreen attacks the adequacy of the United States' allegations as to all three of these elements.

i.  *An Obligation to Pay or Transmit Money*

Under the False Claims Act, an obligation is, simply put, a legal duty to repay money. *See* § 3729(b)(3) (providing that an obligation as a duty "arising from . . . the retention of an overpayment"). Walgreen concedes that "[i]f it actually received money to which it was not entitled because of Reilly's conduct," it would have an obligation "to repay those amounts under the common-law theories Plaintiffs plead[.]" [Def.'s Mem. at 2]; *see Am. Textile Mfrs.*

*Inst., Inc. v. The Limited, Inc.*, 190 F.3d 729, 736 (6th Cir. 1999) ("To recover under the False Claims Act . . . . [t]he duty . . . must have been an obligation in the nature of those that gave rise to actions of debt at common law for money or things owed." (quotation omitted)).

Plaintiffs sufficiently allege that Walgreen received money—TennCare payments—to which it was not entitled. *See* [Compl. ¶ 78 ("Defendant, through or at the direction of Reilly, altered patients' records and submitted false documents and claims to TennCare, to Defendant's financial benefit."); *see also* [*id.* ¶¶ 39–88 (alleging the fraud in specific detail, as well as the amounts of fraudulent proceeds that Walgreen received)]. Plaintiffs have therefore pleaded sufficient facts showing that Walgreen had a legal duty, or an obligation, to repay that money. The Court must next address whether the United States has also pleaded facts showing that Walgreen had knowledge of that obligation. *Harper*, 842 F.3d at 433.

### ii. *Knowingly Obligated to Pay or Transmit Money*

The False Claims Act fully defines an "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3). Congress added this definition to the False Claims Act in 2009, when it amended the Act through passage of the Fraud Enforcement and Recovery Act, Pub. Law 111–21, 123 Stat. 1617 (2009), in response to "'confusion' that had arisen among several courts that had 'developed conflicting definitions of the term 'obligation.''" *U.S. ex rel. Kane v. Healthfirst, Inc.*, 120 F. Supp. 3d 370, 380 (S.D.N.Y. 2015) (quoting S. Rep. No. 111–10, at 441 (2009)). In the Patient Protection and Affordable Care Act, Pub. L. No. 111–148, § 6402, 124 Stat. 119 (2010), Congress went on to define the term "overpayment" as "any funds that a person receives or retains under [Medicare] or [Medicaid] . . . to which the

person, after applicable reconciliation, is not entitled under [Medicare or Medicaid]." 42 U.S.C. § 1320a-7k(d)(4)(B). The Affordable Care Act requires a person who receives an overpayment to report it and return it to the appropriate entity within sixty days of "the date on which the overpayment was identified," a requirement that has become known as the sixty-day rule. *Id.* § 1320a-7k(d)(2)(A). If a person retains an overpayment beyond sixty days, the overpayment becomes an obligation under the False Claims Act. *Id.* § 1320a-7k(d)(3).

As Walgreen correctly points out, however, a person's retention of an overpayment for more than sixty days does not *automatically* create an obligation; rather, that person must act *knowingly*—that is, with "actual knowledge of," "deliberate ignorance of the truth or falsity of," or "reckless disregard for the truth or falsity of" the fact that he has a legal obligation to return the overpayment to the United States. 31 U.S.C. § 3729(b)(1)(A)(i)–(iii); *see Harper*, 842 F.3d at 436 (declaring that the term "knowingly," as it appears in the False Claims Act and applies to reverse false claims under § 3729(a)(1)(G), "must refer to a defendant's awareness of *both* an obligation to the United States *and* his violation of that obligation"); *see also* U.S.C. § 1320a-7k(d)(4)(B) (stating that "[t]he terms 'knowing' and 'knowingly' have the meaning given those terms" under the False Claims Act). In short, a person who retains an overpayment for greater than sixty days cannot be strictly liable.

Walgreen disputes whether the United States has alleged sufficient facts showing that it knowingly failed to report and return the overpayments within sixty days; in other words, it believes the complaint is shy of allegations showing that it "identified" the overpayments. 42 U.S.C. § 1320a-7k(d)(2)(A). According to Walgreen, the United States pleads that three events put it "on notice" of the alleged overpayments: "(1) Walgreens' own internal investigation, (2) Reilly's guilty plea, and (3) a subsequent communication in which Plaintiffs 'made Walgreen[s]

aware, through its counsel, of overpayments for up to 14 additional TennCare beneficiaries.'" [Def.'s Mem. at 5–6 (alteration in original) (quoting Compl. ¶ 85)]. Walgreen emphasizes that, in these allegations, "***all*** of the information Walgreens had about the supposed overpayments ***came from Plaintiffs themselves***." [*Id.* at 18]. "Plaintiffs' knowledge of the supposed overpayments," Walgreen asserts, "vitiates any notion that Walgreens fraudulently avoided returning them" because "[t]here simply cannot be fraud under the Reverse FCA where the government was not deceived." [*Id.* at 16]. Along these same lines, Walgreen argues that the "[m]ere retention of overpayments the government knows about may deprive the government of funds it is owed, but that is not fraud." [*Id.*].

In lockstep, the Chamber of Commerce decries the United States' reverse false claim as "a novel and dangerous theory of reverse false-claims liability" because it espouses an "on notice" theory of liability. [Amicus Br. at 1]. The Chamber of Commerce asserts that Walgreen should not have to suffer "face crushing treble damages and penalties" merely because "the government put Walgreens 'on notice' that it may have received overpayments as a result of" Ms. Reilly's fraud, and it insists that "[i]t is . . . not enough for the government to allege that a company did not repay amounts the government contends are due." [*Id.* at 2, 3, 7]. The United States, it contends, has to allege facts showing that Walgreen actually "*concluded* that it had received an[] overpayment." [*Id.* at 2]; *see* [Def.'s Mem. at 19 (arguing that the allegations are deficient because "Plaintiffs do *not* aver that . . . Walgreens came to the same conclusion [as Plaintiffs did]"). In response, the United States urges the Court to reject Walgreen's and the Chamber of Commerce's arguments, branding them as an effort on Walgreen's part to dodge liability by "bur[ying] its head in the sand." [Pls.' Resp. at 29 (alteration in original) (quoting *U.S. ex rel. Ormsby v. Sutter Health*, 444 F. Supp. 3d 1010, 1081 (N.D. Cal. 2020))].

For all the attention that Walgreen devotes to discrediting the United States' on-notice theory of liability, the legal authority it relies on is feeble at best. First, Walgreen cites a report from the Senate Judiciary Committee, which states that "the violation of the FCA for receiving an overpayment may occur once an overpayment is knowingly and improperly retained, *without notice to the Government about the overpayment*." S. Rep. 111-10, at 442 (2009) (emphasis added). According to Walgreen, this statement means that "[t]here simply cannot be fraud under the Reverse FCA where the government was not deceived." [Def.'s Mem. at 16]. Similarly, Walgreen also quotes a statement from former Senator John Kyl, who, during a floor debate, said that, under the False Claims Act, "'improper means' must be means that are malum in se— that is, means that are inherently wrongful and constitute an independent tort." 155 Cong. Rec. S4531, at S4539-4540 (2009). In Walgreen's view, Senator Kyl's statement firmly establishes that "Congress made clear" that a reverse false claim is not actionable when the Government has knowledge of the overpayments. [Def.'s Reply at 15].

But outside of perhaps a conference report—in which the House and the Senate work to resolve disagreements between their respective versions of a bill, acting, essentially, as one body—legislative history is of notoriously dubious worth as a measure of congressional intent, especially when a party serves it in piecemeal quantities, as Walgreen has done here. *See Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 73 (2004) (Scalia, J., dissenting) ("I have often criticized the Court's use of legislative history because it lends itself to a kind of ventriloquism. The Congressional Record or committee reports are used to make words appear to come from Congress's mouth which were spoken or written by others individual Members of Congress, congressional aides, or even enterprising lobbyists."); *see also Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 390–391 (2004) (Scalia, J., concurring) ("[T]he statements of individual

Members of Congress (ordinarily addressed to a virtually empty floor) . . . [are not] a reliable indication of what a majority of both Houses of Congress intended when they voted for the statute before us. The *only* reliable indication of *that* intent—the only thing we know for sure can be attributed to *all* of them—is the words of the bill that they voted to make law."); Victoria F. Nourse, *A Decision Theory of Statutory Interpretation: Legislative History by the Rules*, 122 Yale L.J. 70, 80 (2009) ("Congressional intent hinges on an obvious error of composition: reducing a multiperson institution to a single person. . . . [T]he very essence of Congress is its plurality, its multiplicity, its 535-ness." (citation omitted)).

Second, Walgreen cites case law in which courts have made the general observation that the False Claims Act is an anti-fraud statute, and this general observation, Walgreen maintains, illustrates that a reverse false claim requires actions that "induce detrimental reliance by the plaintiff," just as principles of common-law fraud do. [Def.'s Reply at 15, 17]. Although the elements of common-law fraud do apply to the False Claims Act to the extent that "they are consistent with the statutory text," Walgreen's reliance on courts' general observation that the False Claims Act is an anti-fraud statute hardly amounts to an exegesis of § 3729(a)(1)(G)'s statutory text, especially when the Court also considers that "[t]he False Claims Act abrogates the common law in certain respects." *Universal Health Servs. v. U.S. ex rel. Escobar*, 579 U.S. 176, 187 n.2 (2016); *see McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." (quotation omitted)).

Under § 3729(a)(1)(G)'s second provision, the relevant provision in this case, liability arises when a defendant has (1) "improperly avoided or decreased an obligation to pay the

government" and (2) "did so knowingly." *Ormsby*, 444 F. Supp. 3d at 1056 (citing *U.S. ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*, 839 F.3d 242, 255 (3d Cir. 2016)). "There is no requirement under [this second provision] to show that the defendant used a false record or statement or that a record or statement was material." *Id.* (footnote omitted) (citing *Victaulic*, 839 F.3d at 255; *United States v. Vandewater Int'l, Inc.*, No. 2:17-cv-04393RGK-KS, 2019 WL 6917927, at *4 n.1 (C.D. Cal. Sept. 3, 2019))). So although Walgreen maintains that a reverse false claim is not actionable unless notice of the overpayments comes from a source other than the Government, § 3729(a)(1)(G)'s second provision does not qualify the element of knowledge in this way, and Walgreen cites no precedent in which any court, by relying on common-law principles of fraud, has qualified the element of knowledge in this way.

Still, Walgreen's objection to the United States' so called on-notice theory of liability does warrant a deeper descent into case law before the Court can put it to rest. In *Harper v. Muskingum Watershed Conservancy District*, the Sixth Circuit addressed the sufficiency of a reverse false claim under § 3729(a)(1)(G) and rejected the plaintiffs' argument that "a defendant acts 'knowingly' when he has notice of a legal obligation, even if the defendant believes the obligation does not apply under the circumstances." 842 F.3d at 437. "[T]he FCA requires Plaintiffs to show far more," the Sixth Circuit said. *Id.* In rejecting plaintiffs' argument, it posited a hypothetical scenario to illustrate when notice of a legal obligation is insufficient to establish liability under the False Claims Act:

> Assume, for example, a party who has notice of a legal obligation to return park land to the government if she stops using the property for 'public-recreation purposes.' Under the [the plaintiff's] reading of the FCA's scienter requirement, if the party constructs a theme park on the land with the reasonable but ultimately mistaken belief that such use comports with the government's use restriction, she would be liable under the FCA. But the FCA is aimed at stopping fraud against the United States and does not create 'a vehicle to police technical compliance with' federal obligations.

*Id.* The Sixth Circuit described this hypothetical as a case of "mistake[n] interpret[ation]" of "a legal obligation," and a mistaken interpretation, it stated, cannot sustain a reverse false claim. *Id.* "'[E]stablishing knowledge under' FCA provisions that use knowledge as scienter requires plaintiffs to 'prove that the defendant knows . . . that [he] violated a[n] . . . obligation,' not simply that he mistakenly interpreted a legal obligation." *Id.* (quotation omitted).

*Harper*, then, holds that an on-notice theory of liability is faulty when the notice leaves ample room for a defendant to mistakenly believe that an obligation does not exist. Because Walgreen cites no precedent indicating that an on-notice theory of liability is improper outside of cases involving mistaken interpretation, the Court will consider only whether the allegations allow for the alternative explanation that Walgreen's alleged retention of the overpayments was a matter of mistaken interpretation. *See Deom v. Walgreen Co.*, 591 F. App'x 313, 320 (6th Cir. 2014) ("When, as here, the context makes the factual allegations at most consistent with both conduct that is actionable and conduct that is not, more is required to 'nudge[] [the] claims across the line from conceivable to plausible.")].

From the allegations, the Court finds no basis to conclude that Walgreen mistakenly believed it had no obligation to return the overpayments to the United States, and it finds every basis to conclude, or at the very least to infer, that Walgreen retained the overpayments despite its knowledge—its actual knowledge—that it had an obligation to return them. The allegations, accepted as true, show that Walgreen first learned that it was possibly in receipt of fraudulent TennCare payments between June 8, 2016, and June 14, 2016, when the Tennessee Bureau of Investigation served them with subpoenas for individual patients' records. [Compl. ¶ 82]. From there, Walgreen, on June 15, 2016, dispatched its "loss prevention personnel" to the Kingsport pharmacy, where they discovered altered records and spoke with an employee who admitted to

falsifying records at Ms. Reilly's instruction. [*Id.* ¶ 83]. Then, in October 2016, Walgreen learned of Ms. Reilly's guilty plea. [*Id.* ¶ 84]. And finally, on September 28, 2017, Plaintiffs notified Walgreen, through its counsel, of specific overpayments. [*Id.* ¶ 85].

With these allegations, the United States attributes the requisite state of knowledge to Walgreen by making specific "reference[s] to [a] factual context," *Iqbal*, 556 U.S. at 686, and these references satisfy Rule 9(b)'s heightened standard because they contain "the time, place and content of" the events and communications that formed Walgreen's knowledge, *Power & Tel. Supply Co. v. SunTrust Banks, Inc.*, 447 F.3d 923, 931 (6th Cir. 2006) (citations omitted); *see U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 642 (6th Cir.2003) (explaining that Rule 9(b) requires a plaintiff to state with particularity the circumstances of the fraud, "i.e., the time, place, and substance"). Given the widescale fraud that occurred under Walgreen's own roof, the huge upsurge in revenue that accompanied the fraud—which saw Walgreen pocket millions of dollars, an astronomical 673 percent increase for its Kingsport pharmacy—and the particularized allegations of Walgreen's step-by-step discovery of the fraud, the United States succeeds in alleging that Walgreen, the alleged *direct* recipient of the overpayments, possessed actual knowledge of the fraud and could not have mistaken the overpayments for legitimate proceeds. [Compl. ¶¶ 75–77].

Although Walgreen strenuously argues that the United States' allegations are defective because they do not contain a specific account of when, exactly, it identified the overpayments, *see* 42 U.S.C. § 1320a-7k(d)(2)(A) (requiring any person who receives an overpayment to report and return it to the appropriate entity within sixty days of "the date on which the overpayment was identified"), Rule 9(b) does not demand the relentless detail that Walgreen advocates for, *see Michaels Bldg. Co. v. Ameritrust Co.*, 848 F.2d 674, 680 (6th Cir. 1988) (stating that Rule

29

9(b)'s purpose is to ensure that a defendant has a "reasonable basis" to make out a claim and respond with an informed pleading); *Kane*, 120 F. Supp. 3d at 388 (stating that an overpayment is "identified" once a defendant is "put on notice of a potential overpayment, rather than the moment when an overpayment is conclusively ascertained," "even if the precise amount due has yet to be determined"); *see also Ormsby*, 444 F. Supp. 3d at 1079 ("[T]he court follows as persuasive *Kane* . . . . Following *Kane*, an overpayment is 'identified' . . . when the 'provider is put on notice of a potential overpayment, rather than the moment when an overpayment is conclusively ascertained.'" (quoting *Kane*, 120 F. Supp. at 387–88)); *Graves v. Plaza Med. Ctrs., Corp.*, 276 F. Supp. 3d 1335, 1347 (S.D. Fla. 2017) ("'[T]he sixty day clock begins ticking when the provider is put on notice of a potential overpayment, rather than the moment when an overpayment is conclusively ascertained[.]" (quoting *Kane*, 120 F. Supp. 3d at 388)); *cf. U.S. ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189, 1202 (10th Cir. 2006) ("[An] 'obligation' need not be for a precise amount in order to be actionable[.]"). Simply, in a case like this—in which the allegations' cumulative effect enables the Court to reasonably infer that a defendant has knowledge of an obligation to return an overpayment, stemming from its knowledge of a fraudulent act—the United States will have satisfied its burden at the pleading stage.

And besides, contrary to Walgreen's assertion otherwise, not *all* the allegations establish that Walgreen's knowledge of the overpayments came directly from Plaintiffs. The United States alleges that Walgreen learned of the fraud *firsthand* when its loss prevention personnel visited the Kingsport pharmacy, where they discovered altered records and spoke with one of their very own employees, who admitted that she doctored records at Ms. Reilly's behest. [Compl. ¶ 83]. In addition, Walgreen directly received a multi-million dollar influx of new payments from TennCare—a figure so at odds with prior years' revenue that it, arguably, should have alerted

Walgreen, as it did Plaintiffs, to the fact that something was amiss, if not seriously wrong, in the Kingsport pharmacy:

> [T]he Kingsport Pharmacy's revenue for October 2014, when the first false prior authorization and medical records were submitted, was $659,502. Hepatitis C drugs accounted for 78% of the revenue for that month. In May 2016, Defendant's Kingsport Pharmacy earned $5,098,765—an increase of 673% in less than two years.

[*Id.* ¶ 75]. Frankly, these facts alone—Walgreen's discovery of altered records, its receipt of a confession from its own employee, and its apparent unprecedented intake of revenue from the Kingsport pharmacy during the perpetration of the fraudulent scheme—support an inference that Walgreen had actual knowledge of the fraud and of an obligation to return the overpayments to the United States. The Court must next address whether the United States has pleaded sufficient facts showing that Walgreen knowingly and improperly avoided that obligation. *Harper*, 842 F.3d at 433.

### iii. *Knowingly and Improperly Avoided an Obligation to Pay or Transmit Money*

The final stage of the Court's analysis requires it to consider whether the United States alleges sufficient facts showing that Walgreen violated its obligation to return the overpayments by knowingly and improperly avoiding that obligation. Walgreen asserts that the allegations are "patently insufficient" to demonstrate that it knowingly and improperly avoided its obligation because its mere "[i]naction" in returning the overpayments "is not the same as avoidance, and yet Plaintiffs have only pled the former." [Def.'s Mem. at 19]. But Walgreen cites no authority to back this assertion, and case law belies it. Although the False Claims Act does not define the phrase "improperly avoids," the United States District Court for the Southern District of New York, in *United States ex rel. Kane v. Healthfirst, Inc.*, a case on which the United States relies, interpreted it to mean "behavior where an individual [1] is put on notice of a potential issue, [2]

is legally obligated to address it, and [3] does nothing." 120 F. Supp. 3d at 394; *see generally United States v. Zabawa*, 719 F.3d 555, 559 (6th Cir. 2013) ("When a statute contains an undefined term, we give the term its ordinary meaning. In determining that meaning, dictionaries are a good place to start." (citation omitted)).

Despite the allegations that Walgreen, between 2016 and 2017, acquired knowledge of the fraud and its obligation to return the overpayments, Walgreen—by the time Plaintiffs filed their complaint four or five years later in mid-2021—had allegedly "made no attempt to refund the payments." [Compl. ¶ 86]. Walgreen exhorts the Court to give no thought to its retention of the overpayments because corporate investigations into alleged violations of the False Claims Act "frequently involve[] the *proper* process of testing the government's theories, debating the facts and the law, and discussing potential resolution." [Def.'s Mem. 20]. "[T]he Complaint," it argues, "fails to overcome this 'obvious alternative explanation,' for its" multi-year retention of the overpayments. [*Id.*]. In like-minded fashion, the Chamber of Commerce maintains that "a company does not do anything 'improper' when it receives allegations from the government, conducts an internal investigation of the matter, and engages in a dialogue with the government about those issues." [Amicus Br. at 9]. If a "company is required to take the government's word for it and immediately meet the government's payment demand or face crushing treble damages and penalties for violating the False Claims Act," [*id.* at 2], then this requirement would "chill internal investigations and settlement discussions," the Chamber of Commerce argues, [*id.* at 9].

But nothing about the allegations even mildly suggests the United States "immediately" called on Walgreen to pay up or face suit. [*Id.* at 2]. In fact, the allegations suggest entirely the opposite. Walgreen developed knowledge of the fraud and its legal obligation as early as June 2016, [Compl. ¶¶ 82–83], and the United States brought suit for the return of the overpayments

in May 2021. Instead of bringing suit in five years' time, should the United States have waited six years to allow Walgreen to conduct an internal investigation to its satisfaction? Eight years? Ten? A delay of any of these lengths would have, conceivably, vaulted the United States' claim outside the statute of limitations. *See* 31 U.S.C. 3731(b)(1) (stating that a claim for a violation of § 3729 "may not be brought . . . more than 6 years after the date on which the violation of section 3729 is committed").

The United States therefore had every right to file its reverse false claim on the date when it elected to file it, and Walgreen's and the Chamber of Commerce's consternation about "harsh sanctions" and "face crushing" treble damages and penalties reads as a gripe over legislative policy, which falls outside the Court's province. *Cf. United States v. Silvestre-Gregorio*, 983 F.3d 848, 856 (6th Cir. 2020) (rejecting amici's arguments because they dealt with "a matter of policy"); *Hammons v. Barkdull*, 460 F. Supp. 3d 687, 697 (E.D. Ky. 2020) ("Indeed, in many instances '[s]tatutes of limitation are arbitrary and unfair, but they represent a policy decision made by the legislative branch of government that after the passage of specified periods of time, claims are not viable.' This Court is unable to ignore the clear directives of the applicable statute of limitation[.]" (first alteration in original) (quotation omitted)).

In sum, the United States' allegations show that Walgreen knew that the overpayments were fraudulent proceeds, knew that it had a legal obligation to return them, and did nothing for over sixty days, in violation of the sixty-day rule. The United States has therefore sufficiently pleaded that Walgreen's knowingly and improperly avoided a legal obligation to pay or transmit money. *See Kane*, 120 F. Supp. 3d at 390 ("Sure enough, the Government's Complaint in this action alleges that Defendants . . . did nothing with the set of claims [that the Government] pointed out as potentially overpaid[.]").

## IV. CONCLUSION

Plaintiffs allege plausible direct and reverse false claims under the False Claims Act. Walgreen's Motion to Dismiss Counts I–VI of Plaintiffs' Complaint [Doc. 16] is therefore **DENIED**. Walgreen's Motion for Leave to File Notice of Supplemental Authority [Doc. 62] is **GRANTED**. Walgreen is **ORDERED** to serve a responsive pleading within fourteen days of this Order's date.

So ordered.

ENTER:

_____
s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE