IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and STATE OF TENNESSEE,<br><br>    Plaintiffs,<br><br> v.<br><br>WALGREEN CO.,<br><br>    Defendant. | Case No. 2:21-CV-00080-JRG-CRW |

**WALGREEN CO.'S OPPOSITION TO MAGELLAN'S
MOTION TO ALLOCATE COST**

  Defendant Walgreen Co. ("Walgreens") opposes the motion (the "Motion") brought by Magellan Medicaid Administration ("Magellan") insofar as it seeks to shift the costs of its document review and production to Walgreens, rather than the State of Tennessee ("the State"). Bedrock rules of discovery dictate that those costs are the responsibility of the State (and of Magellan as the State's agent). To the extent Magellan's contract with the State does not require the State to bear these costs, which Magellan admits it has incurred voluntarily, that issue is far beyond the scope of this litigation—in fact, it is not even clear how Magellan, a non-party, can properly bring this Motion. Magellan stands in the shoes of the State for purpose of this action and thus any request to shift costs should have come directly from the State.

  Moreover, shifting costs from Magellan to Walgreens is plainly inappropriate in light of the foundational "presumption" in civil discovery "that the responding party must bear the expense of complying with discovery requests." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 358 (1978). Here, the responding party—the State—has not filed a motion seeking to shift these costs onto Walgreens; nor could it, in light of the clear accessibility, relevance, and proportionality of

the discovery Walgreens seeks, and the relatively modest burden the discovery imposes on the State (or its agent, Magellan). Magellan has not come anywhere close to clearing the extremely high bar that Courts have established to override the default rule regarding costs of discovery.

The discovery at issue concerns the most vital aspect of a False Claims Act ("FCA") lawsuit—the submission of claims for government payment and whether the claims in question were materially false. Magellan, as the State's pharmacy benefits provider ("PBM"), stood in the State's shoes in electing to pay the claims at issue despite having the very evidence the State now says shows those claims were ineligible for payment. If the discovery Walgreens seeks from Magellan uncovers evidence that Magellan knew that the claims were ineligible or acted subjectively in applying TennCare's prior authorization criteria, for example, such evidence would go a long way towards disposing of the case.

Not only is the discovery in question highly relevant, but the burdens on the State (and Magellan, as its agent) are completely reasonable. Given that the State is seeking treble damages and civil penalties of tens of millions of dollars, *see generally* Complaint, ECF 1, Magellan's estimate of approximately $168,000 to respond to this discovery is an eminently reasonable burden for the State (or Magellan) to shoulder. It is important to note here, moreover, that a significant portion of Magellan's estimated costs is attributable to Magellan's unilateral decision to undertake an unnecessary page-by-page review of potentially responsive documents. Magellan made that election despite the Protective Order; and despite Walgreens' offer to enter into a Rule 502(d) stipulation, giving Magellan the option to use technology-assisted review ("TAR") to reduce the costs of human review and claw back any allegedly privileged documents it inadvertently produces, ECF 52 at ¶¶ 14–17.

Finally, Magellan's attempt to shift costs to Walgreens is especially unreasonable in light of the significant and avoidable costs that Walgreens has incurred in trying to get the State to comply with its discovery obligations (including by producing responsive documents through its agent, Magellan). Indeed, but for the State's and Magellan's unreasonable and frivolous argument—that Magellan was not the State's agent in this case—which this Court rejected—Walgreens would not have been required to undergo numerous meet-and-confers and file motions to compel. The State's argument in its response to the Motion (the "Response") that Walgreens should bear the cost of discovery because it allegedly engaged in FCA violations is nonsensical and devoid of any legal support. In short, this Court should deny the Motion.

### I. BACKGROUND AND PROCEDURAL POSTURE

On February 17, 2022, the Court held a hearing on Walgreens' Motion to Compel Magellan to: (1) sit for a deposition pursuant to Federal Rule of Civil Procedure 30(b)(6); and (2) produce all responsive documents expeditiously by no later than February 28, 2022.[1] ECF 70; ECF 84. During the hearing, the Court ordered Magellan, the State, and Walgreens to conduct an in-person meet-and-confer. ECF 84 at 1. In advance of the meet-and-confer, Walgreens proposed the use of TAR, Ex. A to Declaration of Michael R. Dziuban ("Dziuban Decl.")[2] at 17–18 (M. Dziuban Email to J. Collins et al., Feb. 17, 2022), and Magellan responded that it would be "amendable to supplementing human review with some [TAR]," Ex. A at 14–15 (J. Collins Email to M. Dziuban et al., Feb. 21, 2022). Walgreens also expressed a willingness to consider certain modifications to

---

[1] Walgreens assumes the Court's familiarity with the procedural history underlying Walgreens' dispute with the State and Magellan over documents in Magellan's possession. Additional detail may be found in Walgreens' February 9, 2022 Motion to Compel (ECF 70).

[2] Exhibits are attached to the Dziuban Declaration.

the parameters for searching Magellan's email data. *See* Ex. A at 2–4 (M. Dziuban Email to J. Collins et al., Feb. 24, 2022). The parties conducted the meet-and-confer on February 25, 2022.

As a result of this meeting, the parties were able to agree, in relevant part, on modifications to Walgreens' search terms and timeframes, and on a narrowing of the list of prior authorization reviewer custodians. Ex. B (Mar. 1, 2022 Letter to J. Wyrick). Following the meet-and-confer, Magellan sent Walgreens a projected cost estimate for the 13 custodians Magellan had already loaded—eight corporate custodians and five prior authorization reviewer custodians. Ex. C at 1 (T. Panciera Email to M. Dziuban et al., Mar. 3, 2022). Magellan estimated that the cost to process and review these 13 custodians would be between $223,588.79 and $266,716.79. *Id.* On March 4, consistent with the parties' discussions on February 25, Walgreens provided Magellan with the names of 12 additional prior authorization reviewer custodians whose data Walgreens believes it is necessary to collect and produce. Ex. D at 2–4 (M. Dziuban Email to J. Collins et al., Mar. 4, 2022). Walgreens also asked Magellan to allocate the costs attributable to document review and document processing, respectively and to include cost-savings afforded by TAR. *Id.* Magellan admitted that TAR would cut its costs in half. Ex. D at 1 (J. Collins Email to M. Dziuban et al., Mar. 4, 2022). In its Motion, Magellan further lowered its estimate and now believes it will cost between $148,826.98 and $167,674.98 to produce everything Walgreens has requested. ECF 100 at 7.

The Motion contains at least two factual inaccuracies that require correction. First, Magellan states that, following syntax errors in the initial search terms Walgreens sent the government in early October (and that the State apparently did not forward to Magellan until October 28), Magellan did not receive revised search terms from Walgreens until December 20. ECF 100 at 3, n. 4. In fact, Walgreens sent revised search terms to the State in early November.

Ex. E at 1 (M. Dziuban Email to P. Bangle et al., Nov. 8, 2021). Additionally, the State informed Walgreens on December 20 that it had "previously forwarded to Magellan" those revised search terms. Ex. F at 1 (A. Campbell Email to M. Dziuban et al., Dec. 20, 2021). Magellan's assertion in its Motion means either that (a) the State in fact had not sent Magellan the revised search terms when it said it did so; or (b) Magellan received the search terms and failed to act on them. Either way, Walgreens is not responsible for the State and Magellan's failure to communicate with one another and to timely respond to Walgreens' discovery requests.

Second, Magellan says that Walgreens was "unwilling to compromise" on the date ranges of its discovery requests until after the February 17 hearing. ECF 100 at 5–6. Not so. In reality, as early as a December 20, 2021 meet-and-confer with Magellan and the State Walgreens indicated that, reserving all rights, it would be willing to start with more limited timeframes for the prior authorization reviewer custodians. Dziuban Decl. ¶ 3. Then, during a January 7, 2022 meet-and-confer, Walgreens stated that if Magellan thought that certain custodians were unlikely to have responsive information post-dating the termination of Magellan's PBM contract, Walgreens was open to limiting the searches for those custodians accordingly. *Id.* ¶ 4. Magellan never responded to this proposal.

## II. LEGAL STANDARD

"[T]he presumption" in civil discovery "is that the responding party must bear the expense of complying with discovery requests." *Oppenheimer*, 437 U.S. at 358. Here, the "responding party" is the State, and therefore to shift costs to *Walgreens* Magellan must show that the *State* (either itself, or through Magellan as the State's agent) should not bear the costs of complying with Walgreens' discovery requests.

Under Rule 26(b)(2)(B), courts "may specify conditions for the discovery" if both undue burden and good cause have been established. Fed. R. Civ. P. 26(b)(2)(B). Magellan "must make

5

particular and specific demonstration[s] of fact that provide sufficient detail as to an undue burden" resulting from the discovery requests. *United States ex rel. Guardiola v. Renown Health*, 2015 WL 5056726, at *3 (D. Nev. Aug. 25, 2015) (internal quotations omitted). If Magellan makes such a showing, Walgreens may still receive the discovery it seeks if it can show "good cause" through a "balancing of the costs and potential benefits of discovery." Fed. R. Civ. P. 26(b)(2)(B); *Semsroth v. City of Wichita*, 239 F.R.D. 630, 637 (D. Kan. 2006). If both undue burden *and* good cause exist, "the court may"—but need not—"specify conditions for the discovery," including the shifting of costs associated with its production. Fed. R. Civ. P. 26(b)(2)(B); *Oppenheimer*, 437 U.S. at 358

As part of its authority to specify "conditions," a court may "condition[] discovery on the requesting party's payment of the costs of discovery." *Oppenheimer*, 437 U.S. at 358. To determine whether cost shifting is appropriate, courts consider a series of factors very similar to the Rule 26 good cause factors and the general proportionality factors. *See* infra III.E. In addition, cost shifting for e-discovery requires the producing party to make the specific showing that the ESI is "from sources [it] identifies as not reasonably accessible because of undue burden or cost." Fed. R. Civ. P. 26(b)(2)(B).

### III. ARGUMENT

#### A. The Discovery at Issue is Critical to this Case

##### 1. The Discovery Is Highly Relevant to the Government's Claims and Walgreens' Defenses

Showing relevance in discovery is "an extremely low bar." *In re Ford Motor Co. Spark Plug and 3–Valve Engine Products Liability Litigation*, 98 F. Supp. 3d 919, 925 (N.D. Ohio 2014). Information is discoverable if it is "relevant to [a] party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in

controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). The Federal Rules of Civil Procedure delineate narrow circumstances in which relevant and proportional discovery may nevertheless be limited. If a party shows that the discovery it seeks is relevant, "the burden shifts to [the other party] to demonstrate that the requests are unduly burdensome or that the materials are otherwise not discoverable under the Federal Rules." *McNeil v. Cmty. Prob. Servs., LLC*, 2019 WL 5957004, at *3 (M.D. Tenn. Oct. 29, 2019).

Here, the government sued Walgreens under the FCA, alleging that Walgreens is vicariously liable for Amber Reilly's submission of fraudulent claims for payment to TennCare via Magellan. The discovery Walgreens seeks from Magellan concerns the very core of those allegations—the process by which the claims were submitted to, reviewed by, and then paid by the government, through the State's contractual arrangement with Magellan. As such, Magellan's treatment of the claims in question is essential to at least three separate elements of the government's claim: (1) the submission of a claim; (2) the falsity of the claim; and (3) the materiality of the alleged false statement.

As to materiality, for example, if employees at Magellan applied TennCare's prior authorization criteria subjectively or chose to ignore discrepancies in the paperwork they reviewed, that would be "very strong evidence" that any misstatements in the prior authorization paperwork were not material to the decisions to pay the claims. *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 195 (2016).

Moreover, the government cannot prove its case-in-chief without proving the existence of a fraudulent claim. *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 878 (6th Cir. 2006)

7

("the fraudulent claim is the *sine qua non* of a False Claims Act violation" (internal quotations omitted)).  Because Magellan was the entity that received, reviewed, and approved all of the relevant prior authorization requests and claims for payment on behalf of the State, Magellan's documents are critical to assessing the merits of the government's claims.  That the State refuses to pay its own agent's costs to produce discovery is no reason to require *Walgreens* to bear the cost of the State's agent producing documents at the heart of the State's case, especially since the State is the plaintiff and therefore assumed the costs of discovery when it filed this lawsuit.

### 2. The Discovery is Proportional To the Needs of this Case

In addition to being directly relevant to the claims and defenses in this case, the discovery Walgreens seeks is also proportional in light of the serious allegations and enormous sums of money at issue in this litigation.  The court's decision in *Am. Mun. Power, Inc. v. Voith Hydro, Inc.*, 2019 WL 6251339, at *12–13 (S.D. Ohio Nov. 22, 2019), illustrates the point.  There, the court compelled a party to spend a further $100,000 on the production of data from twelve email custodians after the party had already searched and produced data for 190 custodians at a cost of $1.1 million.  *Id.*  The court found that the additional cost was "not disproportionate" to the alleged damages at stake in the action—$40 million—and, because the requested discovery was relevant and could not be discovered from a different source, the party was required to produce it.  *Id.* at 13.  The cost of discovery in *Voith* comprised 3% of the total damages alleged in the case.  *Id.*  Here, the government has alleged actual damages of $5,929,954 and sought trebling of those damages and civil penalties for *both* the State and the United States—that is, the government seeks nearly $28 million from Walgreens.  The costs Magellan claims it will pay to produce responsive documents—$167,674.98 at most—are a mere 0.6% of that figure—far less than the 3% the court in *Voith* found proportional.

The information Walgreens seeks is also uniquely in Magellan's possession. The custodians are or were Magellan employees, and Walgreens is seeking their internal communications regarding the prior authorization process. Walgreens cannot access this information from any source other than Magellan. Moreover, Magellan is a subsidiary of Centene, a company with over $32 billion in revenue in 2021, and is an agent of the State—a plaintiff in this case—which also has more than sufficient resources to cover the costs of reasonable discovery requests.[3]

Additionally, the maximum cost burden Magellan claims it will incur—$167,674.98—is modest compared to the potential benefits of the discovery, insofar as the evidence the discovery yields could dispose of this entire case, which the government says is worth $28 million. The burden clearly does not outweigh the benefit.

Finally, Magellan's anticipated costs are a product of decisions made by the *State*: its decision to outsource TennCare's claims administration to Magellan; its decision to file a lawsuit that put Magellan's work in that capacity squarely at issue; and its decision not to communicate effectively with Magellan regarding the discovery requests despite knowing that they implicated Magellan's documents. In its capacity as the State's PBM, as a provider of services to a Medicaid program, Magellan could and should have foreseen receiving requests such as Walgreens' RFPs, given the government's persistent focus on fighting healthcare fraud via claims audits, FCA cases, and other forms of legal action. This relationship, and the State's decision to bring this case, would make it all the more inequitable for *Walgreens* to bear Magellan's costs in assisting the State with

---

[3] Centene Corporation Reports 2021 Results, Centene Corporation (Feb. 8, 2022), https://investors.centene.com/_assets/_444a194e1e9e461c04d85ddd474c078c/centene/news/2022-02-08_CENTENE_CORPORATION_REPORTS_2021_1017.pdf.

9

responding to discovery requests that go to the heart of a lawsuit that the State chose to bring with knowledge that its claims would involve Magellan.

### B. Magellan Has Not Demonstrated That the Requested Discovery Is Reasonably Inaccessible

The factors set forth above all favor the discovery Walgreens seeks, and demonstrate that the State (or its agent, Magellan) should bear the associated costs. Magellan nonetheless argues that cost shifting is appropriate based on the availability of a protective order under Rule 26(c). ECF 100 at 9. The proper framework for analyzing cost shifting related to ESI, however, is that set forth in Rule 26(b)(2)(B), which states that "[a] party need not provide discovery of [ESI] from sources that the party identifies as not reasonably accessible because of undue burden or cost." Fed. R. Civ. P. 26(b)(2)(B). Magellan's argument ignores the application of this ESI-specific rule.

When the Advisory Committee added Rule 26(b)(2)(B) in 2006, it explained that "the reasonable costs of retrieving and reviewing electronically stored information should be born[e] by the responding party, unless the information sought is not reasonably available to the responding party in the ordinary course of business." *Cason-Merenda v. Detroit Med. Ctr.*, 2008 WL 2714239, at *4 (E.D. Mich. July 7, 2008) (quotation omitted). In order for ESI to be considered "not reasonably accessible" under this rule, it must be stored in a format not readily accessed—such as backup tapes. *Id.* at *3; *cf. Champion Foodservice LLC v. Vista Food Exch., Inc.*, 2016 WL 6638614, at *3 (N.D. Ohio Mar. 29, 2016) (denying motion to reconsider where court ordered cost shifting because ESI was not stored in reasonably accessible format but rather on backup tapes, deleted data sources, and legacy systems).

Magellan has not argued—and cannot argue—that the documents Walgreens seeks are stored in an inaccessible format. In fact, Magellan has admitted that all the email data it has retrieved exists either in a readily accessible format such as an active Office 365 environment or

archive folders that Magellan already has transferred to its ESI vendor. *See* Ex. G at 1–2 (J. Collins Email to M. Dziuban et al., Jan. 20, 2022). Indeed, Magellan already had "ingest[ed] and host[ed]" the email data of 13 custodians, without incurring any unusual cost attributable to the format or location of the data. ECF 100 at 7. "Thus, to the extent that [Magellan] maintains that the information produced by it in discovery [is] accessible, court ordered cost shifting is inappropriate." *Cason-Merenda*, 2008 WL 2714239, at *3.

Magellan's reliance on *Lawson v. Spirit AeroSystems, Inc.*, an out-of-circuit case currently pending appeal, for the application of Rule 26(c) is misplaced. 2020 WL 3288058, at *8 (D. Kan. June 18, 2020), *appeal filed*, No. 21-3219 (10th Cir. Dec. 1, 2021); ECF 100 at 9. The law in this Circuit is clear: Rule 26(b)(2)(B) bars cost shifting—and Rule 26(c) therefore simply does not apply—where, as here, ESI is reasonably accessible. *Cason-Merenda*, 2008 WL 2714239, at *3.

**C. Magellan Has Not Otherwise Demonstrated That Producing the Requested Discovery Would Impose an Undue Burden**

Even if it could demonstrate technical inaccessibility (it has not and cannot), Magellan has not demonstrated that Walgreens' discovery requests would impose an "undue burden or cost." Fed. R. Civ. P. 26(b)(2)(B). If Magellan wishes to avoid the costs of the discovery, it "must make particular and specific demonstration[s] of fact that provide sufficient detail as to an undue burden" it would suffer if it were required to incur those costs. *Guardiola*, 2015 WL 5056726, at *3 (internal quotations omitted). Since the State is the responding party in this case and therefore presumptively bears the costs of discovery, moreover, Magellan cannot shift costs to *Walgreens* without showing that those costs would impose an undue burden on the *State*. It has not done so.[4]

---

[4] In its Response, the State provides examples of "numerous cases" where "federal courts have allocated the costs of ESI . . . to the requesting party." ECF 105 at 3. These cases exclusively address cost shifting in favor of parties subject to subpoenas under Rule 45 and are entirely inapplicable to the facts of this case. *Id.* at 3–4.

As an initial matter, the costs Magellan claims it will incur in connection with the requested discovery pale in absolute terms in comparison to what the State has faced in other cases. In *John B. v. Goetz*, for example, the court concluded that a production of discovery that could cost TennCare up to $10 million was not unduly burdensome. 879 F. Supp. 2d 787, 883–84 (M.D. Tenn. 2010). That figure is nearly 60 times larger than that at issue in this case. *See id.* If TennCare, whose officials were the defendants in *Goetz*, was not unduly burdened by spending $10 million on discovery, there is no way it could be unduly burdened by approximately $168,000, especially in a case the State itself brought. Thus, even assuming Magellan is entitled to shift its costs to the State in this case, pursuant to its contractual arrangements or otherwise, Magellan cannot force Walgreens to foot the bill.

In any event, Magellan's attempts to portray these costs as unduly burdensome are meritless. Magellan argues that the timeframe requested by Walgreens' RFPs caused it to incur "significant, unnecessary cost" because Walgreens "refused to limit the time frame" until after the February 17 hearing before this Court. ECF 100 at 5–6, 10. This is inaccurate. Walgreens stated in two meet-and-confers with Magellan and the State that, reserving all rights, it would be willing to consider more limited timeframes for particular custodians, if Magellan wished to propose them. Dziuban Decl. ¶¶ 3–4. Magellan never did so. Moreover, all of the custodians whose data Magellan agreed to search *prior* to demanding cost shifting continue to be among the custodians that the parties (including Magellan) agree that Magellan should indeed search, and only now has Magellan demanded cost shifting. *Compare* Ex. G at 3–5 (M. Dziuban Email to J. Collins et al., Jan. 14, 2022) *with* Ex. D at 2–4 (M. Dziuban Email to J. Collins et al., Mar. 4, 2022). Magellan has *always* recognized that the custodians on which Walgreens is focused are critical to this case

12
Case 2:21-cv-00080-JRG-CRW Document 107 Filed 03/17/22 Page 12 of 18 PageID #: 1781

and long ago agreed to collect and search those custodians' accessible data without seeking any sort of relief from the Court. Accordingly, it is improper for Magellan to raise cost concerns now.

Moreover, Magellan's cost estimate remains significantly higher than necessary in light of the multiple accommodations to which Walgreens has agreed in order to make Magellan's review more efficient. For example, Magellan's estimate assumes that human reviewers will review all of the documents that hit on Walgreens' search terms. *See* ECF 100-1, at Ex. E, F. Walgreens, however, has informed Magellan that it is willing to enter into a non-waiver stipulation under Federal Rule of Evidence 502, to allow Magellan to claw back—at any time and for any reason— any documents in its productions. The Protective Order in this case likewise provides protections for a party that inadvertently produces privileged material. ECF 52 at ¶¶ 14–17. Accordingly, Magellan need not manually review every search term hit. *Cf. John B. v. Goetz*, 879 F. Supp. 2d 787, 883 (M.D. Tenn. 2010) ("[T]he most significant contributor to the cost of privilege screening . . . is fear" and "[c]ourts recognize that scanning of vast amounts of ESI utilizing key words to identify privileged information can significantly reduce the costs of a privilege review") (citation omitted)). Instead, Magellan can and should simply use TAR to identify which search term hits are responsive, filter out potentially privileged documents using keyword searches, and produce the documents that are not filtered out. Given the feasibility of this approach, any burden associated with a manual review of all search term hits is a burden that Magellan is imposing upon itself.

Magellan's argument that it is particularly burdened due to its status as "a non-party" with "no interest in [this] litigation" also flies in the face of this Court's multiple rulings that Magellan is the State's agent for purposes of discovery. ECF 70-4 at 8:17–19. As the Motion makes clear, much of the burden Magellan now claims to face is, by its own admission, a result of *the State's*

failure for several months at the end of 2021 to negotiate search terms and custodians with Walgreens, and *the State's* failure even to tell Magellan "that it did not plan to do so." ECF 100 at 13. *See also id.* at 16 ("[Magellan] had to rely on the State to advocate on its behalf" opposite Walgreens, and "[b]y the time Magellan received custodians and search terms, the parties were already at the Motion to Compel stage."). Moreover, if the State had wished to protects its agent, Magellan, from costs it viewed as unduly burdensome, the State should have brought this motion itself, as a party to this action. In the Response, the State does not even attempt to deny the examples of the State's discovery failures Magellan identified that have caused Walgreens to incur unnecessary legal costs. *See* ECF 105. The State also does not provide a single argument to counter Magellan's assertion in its Motion that the State should share in the costs of Magellan's discovery efforts. *See id.* The State brought this lawsuit and the State put Magellan in the position in which it now finds itself. If this Court finds that Magellan should not bear its costs alone, the State—not Walgreens—should share in those costs.

Even if Magellan were considered a non-party rather than an agent of the State, and even setting aside the fact that costs should shift to the State (if at all), cost shifting would still be inappropriate because Magellan is "the central and key non-party" in the case. *In re Am. Kidney Fund, Inc.*, 2019 WL 1894248, at *9 (D. Md. Apr. 29, 2019). In *American Kidney Fund*, the court stated that a non-party's interest in the litigation stemmed from the risk of reputational harm and further litigation in the event that the allegations against the entity were proven. *Id.* So too here. If Magellan is a non-party, then it is "the central and key non-party" given its role as TennCare's PBM—and the possibility that Magellan's employees knowingly disregarded what the State says were obvious indicia of fraud carries significant reputational and litigation risk for Magellan. At

the end of the day, Magellan's insistence that it is a disinterested non-party to this lawsuit is therefore incorrect, even setting aside Magellan's relationship with the State.[5]

### D. Walgreens Has Shown Good Cause for the Requested Discovery

Even assuming Magellan could demonstrate undue burden (it cannot), the Court should deny the Motion. Rule 26(b)(2)(B) provides that courts may still order the production of ESI if "the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C)." Fed. R. Civ. P. 26(b)(2)(B). All the factors listed in the Advisory Committee Notes demonstrate that Walgreens has good cause to seek this discovery:

(1) Walgreens' discovery requests to Magellan are specific. Walgreens has "repeatedly and consistently narrowed [its] discovery requests and worked with [Magellan] to reduce [its] production burden." *Guardiola*, 2015 WL 5056726, at *6–7.

(2) The documents sought are exclusively within Magellan's possession, custody, and control.

(3) The State's admitted delay in implementing a document hold for this case suggests that relevant information may have been destroyed.

(4) Magellan admits that it "indisputably has discoverable documents and . . . ESI . . . relevant to this matter." ECF 100 at 1. Walgreens likewise is certain that it will find relevant information in the documents it has requested from Magellan.

---

[5] Magellan's insistence that it lacks a contractual discovery obligation gains no force with repetition. As Walgreens explained in its reply brief in support of its original motion to compel regarding Magellan, Magellan's discovery obligations under the PBM contract clearly survive the termination of that agreement. *See* ECF 55 at 2–3. Either way, Magellan's argument would at most warrant requiring the State to bear a share of Magellan's costs, not Walgreens.

(5) Walgreens reasonably expects to find communications about Magellan's review of the claims at issue, and how the reviewers were trained and instructed to apply TennCare's prior authorization criteria. This information is essential to an FCA litigation.

(6) The issues at stake are indisputably important for both sides as well as the public, given their potential impact on Medicaid recipients.

(7) Finally, Magellan has the resources to cover the costs. Magellan is the subsidiary of multi-billion dollar healthcare company Centene Corporation, which in 2021 alone reported over $32 billion in revenue.[6]

These factors clearly establish good cause for Walgreens to seek the discovery at issue.

### E. The Court Should Not Order Cost Shifting As a Condition for the Discovery

Under Rule 26(b)(2)(B), courts "may specify conditions for the discovery" if both undue burden and good cause have been established. Fed. R. Civ. P. 26(b)(2)(B). As part of its authority to specify "conditions," a court may "condition[] discovery on the requesting party's payment of the costs of discovery." *Oppenheimer*, 437 U.S. at 358. To determine whether cost shifting is appropriate, courts consider a series of factors very similar to the Rule 26 good cause factors and the general proportionality factors "weighted in the following order: (1) the extent to which the request is specifically tailored to discover relevant information; (2) the availability of such information from other sources; (3) the total cost of production, compared to the amount in controversy; (4) the total cost of production, compared to the resources available to each party; (5) the relative ability of each party to control costs and its incentive to do so; (6) the importance of the issues at stake in the litigation; and (7) the relative benefits to the parties of obtaining the

---

[6] Centene Corporation Reports 2021 Results, Centene Corporation, at 1 (Feb. 8, 2022), https://investors.centene.com/_assets/_444a194e1e9e461c04d85ddd474c078c/centene/news/2022-02-08_CENTENE_CORPORATION_REPORTS_2021_1017.pdf.

information." *Guardiola*, 2015 WL 5056726, at *10. As explained above, because Magellan has not demonstrated undue burden, cost shifting is impermissible. To the extent the Court wishes to take the cost shifting factors into consideration anyway, Walgreens already has demonstrated—in its good cause and proportionality analyses—that these cut in its favor.

Factor (5) is the only factor conceptually unique to the cost shifting analysis. It favors shifting cost to the party that has the greater ability to control costs but the lesser incentive to do so. *See Guardiola*, 2015 WL 5056726, at *11. Magellan, the State, and Walgreens all have some ability to control the cost discovery imposes on Magellan—Walgreens by managing the scope of its discovery requests, the State by assisting Magellan or reimbursing its costs for assisting the State in its discovery responses, and Magellan by agreeing to use more economical methods to minimize human review of documents prior to production. Walgreens cannot narrow the scope of its requests any further while still obtaining the information it needs in order to defend itself against the government's allegations. Magellan, on the other hand, has refused to agree to use TAR and a Rule 502 stipulation to facilitate the production of documents without human review for privilege purposes—methods that would cut costs significantly. Moreover, both Magellan and Walgreens have incentives to keep costs low, as neither wishes to produce or review copious amounts of irrelevant information. Factor (5) therefore counsels against shifting any portion of Magellan's costs to Walgreens.[7]

---

[7] Perplexingly, Magellan argues that Walgreens has no incentive to control costs because it did not subpoena Magellan. ECF 100 at 13. This ignores the fact that Magellan is the State's agent and thus stands in the shoes of the State for discovery purposes, so a subpoena for documents was never necessary.

## IV. CONCLUSION

For the foregoing reasons, Walgreens respectfully requests that the Court deny the Motion or, alternatively, order the State to bear Magellan's costs.

Date: March 17, 2022

Clint J. Woodfin #016346
SPICER RUDSTROM, PLLC
800 S. Gay Street, Suite 1400
Knoxville, TN 37929
Tel: (865) 673-8516
cwoodfin@spicerfirm.com

Respectfully submitted,

/s/ *Reed Brodsky*
Reed Brodsky* (NY Bar #2843019)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Tel: (212) 351-5334
rbrodsky@gibsondunn.com

Jonathan M. Phillips* (DC Bar #989061)
Michael R. Dziuban* (DC Bar #1034156)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue NW
Washington, DC 20036-5306
Tel: (202) 955-8500
jphillips@gibsondunn.com
mdziuban@gibsondunn.com

*Attorneys for Defendant Walgreen Co.*
**Admitted pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2022, the Clerk of Court was requested to file the foregoing Opposition to Magellan's Motion to Allocate Cost. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's electronic filing system.

/s/ *Reed Brodsky*
Reed Brodsky

*Attorney for Defendant Walgreen Co.*